# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
May 18, 2022

Lyle W. Cayce
Clerk

No. 19-60647

Giscard Nkenglefac,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

---

Petition for Review of the Order of the
Board of Immigration Appeals
BIA No. A216 591 99

---

Before Higginson, Willett, and Ho, *Circuit Judges.*

Stephen A. Higginson, *Circuit Judge*:

Petitioner Giscard Nkenglefac, a native and citizen of Cameroon, applied for admission into the United States on May 9, 2018. The immigration judge ("IJ"), Agnelis Reese, denied Nkenglefac's application for relief from removal and ordered him removed to Cameroon after determining that Nkenglefac was not credible. The Board of Immigration Appeals ("BIA") subsequently affirmed the IJ's determination, and Nkenglefac was removed to Cameroon. Nkenglefac now petitions for review

No. 19-60647

of the BIA's dismissal of his appeal from the IJ's denial of application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). Nkenglefac challenges the IJ's reliance on his U.S. Customs and Border Protection ("CBP") and asylum credible fear interviews that were not entered into the hearing record of the removal proceeding, nor, indeed, raised in that hearing at all, to make an adverse credibility finding.

I.

A.

Nkenglefac testified before the IJ[1] that he was a native and citizen of Cameroon, living in the city of Muyuka. After graduating high school in 2008, he was prevented from obtaining further education because he spoke English instead of French. In 2013, after working two other jobs, Nkenglefac bought a taxi and became a taxi driver.

In January 2014, Nkenglefac became a member of the Southern Cameroon National Council ("SCNC"), a Cameroonian political party. As a member of the party, Nkenglefac organized and attended political meetings, protests, and rallies. He also attempted to recruit new party members. The SCNC's goal was for the English-speaking southern part of Cameroon to secede from Cameroon. On cross-examination, he acknowledged that the government of Cameroon considers the SCNC to be a criminal organization.

Nkenglefac was arrested in January 2017, while attending a secret SCNC meeting at a house in Muyuka. There were approximately 80 to 100 people present when police arrived. Some people fled and escaped; others, including Nkenglefac, were caught and arrested. Nkenglefac was held at a police station for seven days before his release. At the time of his arrest,

---

[1] The information contained in the following section of this opinion was taken from the hearing record, which – except as discussed below – has not been contested.

police forced him to stand with his arms over his head and jump like a frog for 30 minutes. Once Nkenglefac arrived at the police station, police interviewed him for 10 minutes and then placed him in an unventilated cell. The police beat him with a baton every morning while questioning him about the leadership of the SCNC, and they refused to offer him food. Nkenglefac suffered pain but did not suffer any physical injuries from this incident. Prior to Nkenglefac's release, police ordered him to sign a document stating that he would no longer participate in any SCNC activities.

The following month, Nkenglefac attended a secret SCNC meeting in the city of Lilale, approximately 40 minutes from Muyuka. Police, security officers, and soldiers broke up the meeting and attempted to arrest those present. Six officials caught Nkenglefac as he attempted to flee. They began beating him with batons and fists; they also kicked him. One official grabbed Nkenglefac's arm and dislocated his shoulder, and two other officials beat him with guns until he lost consciousness. The police took Nkenglefac to the police station briefly before he was released. His family took him to a local hospital, which did not admit him. His family then took him to a regional hospital in the city of Buea, which was approximately one hour from Muyuka. Nkenglefac regained consciousness in the hospital, where he remained for 45 days. He suffered swelling, bruising, blood clots on his eyes, and restricted arm movements due to his shoulder injury.

After his release from the hospital, Nkenglefac stayed in Buea and lived with his aunt for about a month. He then returned to his home in Muyuka and learned that the police had issued a warrant for his arrest. Rather than stay and face the charges, Nkenglefac returned to Buea in May 2017 and rented an apartment. He remained in Buea for approximately 8 to 12 months.

Nkenglefac's next encounter with police happened in Buea in 2018. Police approached him while he was in his taxi distributing flyers that encouraged all English-speaking southern Cameroonians to engage in a

general strike. When police approached his vehicle, Nkenglefac sped off. The police pursued him for 15 to 20 minutes but were unable to catch him. Nkenglefac wrecked his taxi into some water near a banana plantation. A passerby took him to Muyuka. He then fled to the city of Kumba. A friend later told him that his taxi had been burned and that the police were looking for him.

Upon learning that the police were looking for him, Nkenglefac fled to Lagos, Nigeria, where he stayed for approximately two weeks. At that point, Nkenglefac learned that Nigerian police were arresting SCNC members and sending them back to Cameroon. Nkenglefac attempted to use his Cameroonian passport to depart Nigeria for Ecuador; however, he was stopped and almost arrested. Nkenglefac returned to the hotel where he had been staying. The next day, he smuggled himself back into Cameroon, avoiding official reentry. He hid on a plantation farm in Muyuka for two to three weeks.

A family member was eventually able to arrange Nkenglefac's departure from Cameroon. He left Muyuka for Douala, a large city in Cameroon, where he was able to use his Cameroonian passport to fly from Cameroon to Rwanda. He then traveled to South Africa, Brazil, Peru, and, finally, Ecuador. He arrived in Ecuador in March 2018, and he spent approximately 10 days there. After leaving Ecuador, Nkenglefac traveled to Colombia with the assistance of a Cameroonian living in Ecuador. He then spent two months travelling to the United States, eventually reaching the country in May 2018. Upon arrival to the United States, Nkenglefac turned himself in to Immigration Officers at the border.

During Nkenglefac's travels to the United States, he was in contact with a cousin in Cameroon. His cousin informed him that the military went to his family home and attacked his younger brother, who was also involved in SCNC protests, beating him to death. His family home was also burned

down. After speaking with his cousin, Nkenglefac had no further contact with his family.

During cross-examination and upon questioning by the IJ, Nkenglefac provided further information about his travels from Cameroon to the United States. For example, Nkenglefac was in Costa Rica for six days. He did not seek asylum there, but he did obtain an entry permit and received transitionary permanency status, which authorized Nkenglefac to remain in Costa Rica for 25 days and gave him the ability to apply to stay longer. Additionally, Nkenglefac stated that he worked while he was staying in Nicaragua and that he lost his Cameroonian passport, phone, and money when the boat he was riding in capsized.

The IJ also inquired about the death of Nkenglefac's father. Nkenglefac explained that his father died in November 2017, while Nkenglefac was still living in Cameroon. At that time, soldiers were conducting a crackdown in Muyuka. They were going house to house, searching for weapons. The soldiers seized his father's farming tools and, during the search of the house, attempted to seize his father's hunting rifle. His father struggled with the soldiers over the gun and was shot in the chest during the struggle. He died of his injuries four to five days later.

## B.

On November 20, 2018, the IJ issued her opinion, deciding that Nkenglefac was not credible. The IJ identified several omissions and inconsistencies, highlighting that, in his declaration in support of his application for relief from removal, Nkenglefac stated that he had been arrested "several" times but provided different answers in both his CBP interview (one arrest during a strike in 2017) and his credible fear interview (two arrests). Secondly, the IJ observed that during his credible fear interview, Nkenglefac relayed that his family's home was searched, and his father's tools were seized, but he apparently did not mention that his father

No. 19-60647

was shot and killed during the incident. Highlighting these alleged inconsistencies, the IJ denied Nkenglefac's application for relief from removal based on lack of credibility.[2]

Because Nkenglefac had failed to demonstrate that he was eligible for asylum, the IJ concluded that he had also failed to demonstrate that he was entitled to withholding of removal. Finally, the IJ concluded that Nkenglefac was not entitled to relief under the CAT because his claim was based on his testimony, which was not credible, and because he had failed to provide corroborating evidence. Therefore, the IJ denied Nkenglefac's application for relief from removal and ordered him removed to Cameroon.

## C.

Nkenglefac timely appealed to the BIA. He argued that the IJ erred by finding that his testimony was not credible because the finding was based on perceived inconsistencies drawn from documents never presented at the removal hearing, namely, the government summaries of his interviews with CBP and asylum officers. He asserted that the IJ's reliance on inferences drawn from these documents, without giving him an opportunity to explain or challenge the alleged inconsistencies, violated his due process rights. He argued that the summaries of those interviews were consistent with his testimony and that many of the inconsistencies or omissions perceived by the IJ were minor and easily explainable. Nkenglefac also challenged the IJ's determination that he failed to provide sufficient corroborating evidence. He argued that his testimony alone was credible and provided a sufficient basis

---

[2] Alternatively, the IJ found that Nkenglefac failed to provide sufficient corroborating evidence to support his claims of past persecution and a well-founded fear of future persecution on account of a protected ground. The BIA upheld these findings on the explicit assumption of an "[a]bsen[ce] [of] credible testimony." Finally, the IJ refused to consider evidence submitted by Nkenglefac (his Exhibit 5), which was submitted two days after the discovery deadline.

to establish past persecution, and that he provided as much documentary evidence as was reasonably available to him. He also disputed the IJ's determination that he failed to carry his burden of establishing past persecution or a well-founded fear of future persecution.

In a divided opinion, the BIA upheld the IJ's adverse credibility inference drawn from Nkenglefac's interviews with CBP and asylum officers. Moreover, the BIA majority stated that Nkenglefac had waived any contrary argument by failing to raise it before the IJ. The BIA specifically noted the alleged inconsistencies concerning the number of times Nkenglefac was arrested and the omission of his father's 2017 shooting death in his credible fear interview. The BIA did not address or rely on any other inconsistency in reaching its determination.[3] Accordingly, the BIA agreed with the IJ's determination that Nkenglefac failed to establish his eligibility for asylum, withholding of removal, or relief under the CAT and dismissed Nkenglefac's appeal. A member of the panel dissented, asserting that the adverse credibility determination was erroneous; that the IJ improperly relied on evidence not in the record; that the evidence, even if properly considered, was generally consistent with his later claims; and that the IJ should have afforded some weight to the documentary evidence contained in Exhibit 5.

Nkenglefac filed a timely petition for review in this court, seeking a stay of removal, which was denied, and Nkenglefac was removed to Cameroon.

---

[3] The BIA further affirmed the IJ's decision to exclude and give no weight to the untimely filed evidence in Exhibit 5, on the ground that the refusal to do so was not clearly erroneous.

No. 19-60647

## II.

Nkenglefac seeks review of the decision of the BIA, issued on August 1, 2019. On appeal, we review only the decision of the BIA, unless the IJ's decision impacted the decision of the BIA. *See Efe v. Ashcroft*, 293 F.3d 899, 903 (5th Cir. 2002). In this case, the BIA determined the IJ's adverse credibility finding was not clearly erroneous; therefore, we have the authority to review those portions of the IJ's decision that impacted the BIA, in addition to the BIA's decision. *Id.* Factual findings are reviewed for substantial evidence and legal determinations are reviewed de novo. *Lopez-Gomez v. Ashcroft*, 263 F.3d 442, 444 (5th Cir. 2001) (per curiam). Constitutional challenges—such as a due process challenge—are reviewed de novo. *See Altamirano-Lopez v. Gonzales*, 435 F.3d 547, 549 (5th Cir. 2006) (per curiam) (citing *Soadjede v. Ashcroft*, 324 F.3d 830, 831 (5th Cir. 2003) (per curiam). Under the substantial evidence standard, this court will not overturn a factual finding unless the evidence compels a contrary result. *Martinez-Lopez v. Barr*, 943 F.3d 766, 769 (5th Cir. 2019) (per curiam).

## III.

Nkenglefac's removal to Cameroon necessitates this court's consideration of its jurisdiction. "This Court must examine the basis of its jurisdiction, on its own motion, if necessary." *Mosley v. Cozby*, 813 F.2d 659, 660 (5th Cir. 1987) (per curiam). "A moot case presents no Article III case or controversy, and a court has no constitutional jurisdiction to resolve the issues it presents." *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999). "An action is moot where (1) the controversy is no longer live or (2) the parties lack a personal stake in its outcome." *Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990). Events occurring after a district court's entry of judgment may render an appeal moot. *See Bailey v. Southerland*, 821 F.2d 277, 278-79 (5th Cir. 1987) (per curiam).

"In cases challenging a BIA decision, the petitioner's removal from the United States generally renders the petition moot unless the petitioner would suffer collateral legal consequences from the challenged decision." *Mendoza-Flores v. Rosen*, 983 F.3d 845, 847 (5th Cir. 2020). If this court were to uphold the BIA's decision, Nkenglefac would "suffer an automatic 'period of inadmissibility following removal.'" *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021) (citation omitted). An automatic period of inadmissibility is a "concrete disadvantage" that is "imposed as a matter of law" and, as such, constitutes an adverse collateral consequence. *See Alwan v. Ashcroft*, 388 F.3d 507, 511 (5th Cir. 2004). Thus, Nkenglefac's removal does not render this case moot.

## IV.

Nkenglefac argues that the IJ erred as a matter of law by drawing negative credibility inferences from summaries of his CBP and credible fear interviews because neither interview was submitted into the record during his proceeding, much less adverted to. Nkenglefac also argues that he did not waive this argument because he could not have raised the issue before the IJ given that he had no notice the IJ would rely on these documents prior to issuance of her decision.

## A.

This court has previously held that reliance on records of credible fear and asylum interviews generally is not improper and that discrepancies among an applicant's credible fear interview, other records, and testimony can be considered in deciding credibility. *See Avelar-Oliva v. Barr*, 954 F.3d 757, 764-65, 767-69 (5th Cir. 2020) (affirming adverse credibility determination due to variances between credible fear interview and testimony); *Singh v. Sessions*, 880 F.3d 220, 226 (5th Cir. 2018) (same); *Arulnanthy*, 17 F.4th at 593-95 (same). "An IJ may rely on any inconsistency

or omission in making an adverse credibility determination as long as the totality of the circumstances establishes that an asylum applicant is not credible." *Singh*, 880 F.3d at 225 (cleaned up).

However, under BIA precedent, "an adverse credibility determination should not be based on inconsistencies that take an alien by surprise." *Matter of Y-I-M-*, 27 I. & N. Dec. 724, 726-29 (BIA 2019) (quote at 726).[4] Correspondingly, we have been clear that "an adverse credibility determination . . . 'must be supported by specific and cogent reasons *derived from the record*.'" *Singh*, 880 F.3d at 225 (emphasis added) (quoting *Wang v. Holder*, 569 F.3d 531, 537 (5th Cir. 2009)); *see also Meza Benitez v. Garland*, No. 19-60819, 2021 WL 4998678, at *3 (5th Cir. Oct. 27, 2021) (unpublished) (per curiam).

Relatedly, this court has approved, but not required, that petitioners should be given the opportunity to explain any *non-obvious* discrepancies that may bear on their credibility. *See Mpesse v. Garland*, No. 20-61207, 2021 WL 4256177, at *5 (5th Cir. Sept. 17, 2021) (unpublished) (per curiam) ("When determining if an inconsistency is obvious, the key question is whether it is reasonable to assume that the applicant was aware of it and had an opportunity to offer an explanation before the IJ relied on it." (cleaned up)). The court in *Mpesse* instructively explained that because the IJ had

---

[4] In addition to the BIA, at least two circuits have imposed limitations on the degree to which an IJ can rely on inconsistencies to make an adverse credibility finding without providing the petitioner with an opportunity to respond or explain the perceived discrepancies. *See Rizk v. Holder*, 629 F.3d 1083, 1088 (9th Cir. 2011) (stating that "an IJ cannot base an adverse credibility determination on a contradiction that the alien could reconcile if given a chance to do so"); *Ming Shi Xue v. BIA*, 439 F.3d 111, 121 (2d Cir. 2006) ("[W]here the perceived incongruities in an asylum applicant's testimony are not plainly obvious, an IJ cannot rely on them to support an adverse credibility ruling without first identifying the alleged inconsistencies for the applicant and giving the applicant an opportunity to address them.").

questioned Mpesse about the inconsistencies at trial, he had been given an adequate opportunity to respond to discrepancies that impacted the IJ's credibility determination. *Id.*

Nkenglefac's claim is distinguishable in two meaningful respects. First, at no point during the hearing before the IJ was Nkenglefac provided with the opportunity to explain any apparent inconsistencies or dispute the accuracy of the records in question, or cross examine the individuals who prepared the interview summaries, much less object to their introduction, or offer views on weight to be given to the evidence. Inspection of the hearing record confirms that Nkenglefac was not given the opportunity to explain perceived inconsistencies in the government summaries of his prior uncounseled interviews.[5] Indeed, the voluminous testimonial record, including extensive government cross-examination and IJ direct inquiry, gives no indication that Nkenglefac had previously made *any* inconsistent statements, yet the IJ, three months later, determined that "inconsistencies and omissions . . . undermine critical parts of Respondent's claim" to such an extent that the court denied "Respondent's application based on lack of credibility."

Second, in *Mpesse,* as well as *all* the other aforementioned cases, such as *Singh v. Garland*, 850 F. App'x 920 (5th Cir. 2021) (unpublished) (per curiam), the CBP and credible fear interviews at issue were submitted into

---

[5] The fact that Nkenglefac was not given an opportunity to explain perceived inconsistencies also distinguishes this case from another recent decision, *Thraiyappah v. Garland*, No. 21-60092, 2022 WL 807405 (5th Cir. Mar. 16, 2022) (unpublished) (per curiam). In that case we highlighted that "Thraiyappah . . . had an opportunity to clarify or explain any perceived inconsistencies and omissions in his prior statements during the merits hearing." *Id.* at *4. Additionally, in cases cited in *Thraiyappah*, the records confirm that the petitioners were given the opportunity to explain or clarify alleged inconsistencies prior to credibility determinations.

the hearing record.[6] Conversely, as the unanimous BIA panel found, "[Nkenglefac's] interviews with asylum officers and broader patrol officers . . . were not introduced into the record."

As explained above, "an adverse credibility determination . . . 'must be supported by specific and cogent reasons *derived from the record*.'" *Singh*, 880 F.3d at 225 (emphasis added) (citation omitted); *see also Mwembie v. Gonzales*, 443 F.3d 405, 410 (5th Cir. 2006) (explaining that the court is not compelled to uphold credibility determinations that are "unsupported by the record"). Because the IJ's credibility determination is not "supported by the record," the BIA erred by affirming it.

## B.

The BIA majority—affirming the IJ's decision—also determined that Nkenglefac's argument regarding the absence of the CBP and credible fear interviews from the record was "waived" because "the [trial] transcript reflects that [Nkenglefac's] former counsel never requested that these records . . . be made a part of the record." However, we fail to understand why Nkenglefac's counsel should have introduced these government summaries into the record to anticipate and explain later-perceived inconsistencies when they were never identified, referenced, or discussed.[7]

---

[6] *See United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020) ("It is well-settled that courts may judicially notice court records as evidence of judicial actions.").

[7] Nkenglefac's brief on appeal to the BIA gave him his first opportunity to respond to the perceived inconsistencies identified by the IJ:

> There is no meaningful distinction between [Nkenglefac's] two arrests, as the respondent allegedly told a CBP officer, and 'several arrests,' as stated in his declaration. His alleged failure to remember the name of the organization which helped secure his release, an organization he had no direct contact with, is irrelevant to his claim. The fact that he allegedly 'did not mention he was physically harmed' during his arrest when he spoke to border patrol officers could have been due to the fact that he was specifically asked if he had been

No. 19-60647

It is also worth noting that there is no evidence—beyond the statement of the BIA majority—that Nkenglefac's counsel failed to preserve this issue on appeal. The issue was discussed at length in Nkenglefac's appeal brief to the BIA and again in his brief to this court. Furthermore, this observation stands in contravention to existing BIA law that "an adverse credibility determination should not be based on inconsistencies that take an alien by surprise." *Matter of Y-I-M-*, 27 I. & N. Dec. 724, 726-29 (BIA 2019) (quote at 726). Notably, the Government's brief on appeal does not argue that Nkenglefac has waived this argument.

V.

We GRANT the petition for review and REMAND this case to the BIA for further proceedings consistent with this opinion.

---

arrested, not if he had been harmed during arrest or detention. Furthermore, the respondent did, in fact, report to border patrol officers that he 'had pain in [his] left shoulder from being restrained from a soldier,' which indicates that he did report harm during that interview and did indicate that the harm was inflicted by a Cameroonian soldier during an arrest or detention. The statement taken by border patrol officers is a brief overview of his claim, not a detailed investigation. Since the interview was not introduced into evidence, however, it is impossible to question or review the questions and responses the respondent provided in such an interview. This makes it impossible for the respondent to challenge the Immigration Judge's assessment of such an interview as well as impossible for this Board to review and determine if the Immigration Judge committed an error.

Likewise, the respondent's failure to disclose to asylum officers that his father had been killed is due to the fact that questions posed specifically related to harm he experienced personally, not harm to others.