# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 22, 2022
Lyle W. Cayce
Clerk

No. 20-60782

Mariana Ndudzi,

*Petitioner*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A201 665 987

Before Higginbotham, Dennis, and Graves, *Circuit Judges*.

Per Curiam:

The opinion issued July 20, 2022 is withdrawn by the panel, and the following is issued in its place:

Mariana Ndudzi, a native and citizen of Angola, petitions for review of a Board of Immigration Appeals (BIA) decision denying her appeal of an immigration judge's (IJ) denial of her application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). She argues that the Agency erred in finding her not credible and failed to review her corroborating evidence. We vacate and remand.

No. 20-60782

## I.

Ndudzi is from Cabinda, an Angolan province that is geographically separate from the rest of Angola, with distinctive dialect and culture. Cabinda is a small, poor, coastal province of Angola that borders the Republic of Congo and the Democratic Republic of Congo. It produces half of Angola's oil but has little local control of its resources and politics.

Cabinda has been home to a "low-level separatist insurgency" since the 1960s. When Angola gained independence from Portugal in the 1970s, the separatist movement coalesced into the Front for the Liberation of the Enclave of Cabinda ("FLEC"). Membership in FLEC is apparently often familial, and FLEC has engaged a violent insurgency against Angola for decades. FLEC's fighting force has dwindled to "a few hundred men at most" in recent years due to a 2006 peace agreement with the Angolan government. But it still has carried out violent attacks in the last decade, including shooting at the Togolese national soccer team as it drove through Cabinda to the African Cup in 2019. The Angolan government now maintains an extensive military presence in Cabinda to quell dissent. Cabinda also remains impoverished and subject to regular human rights violations at the hands of Angolan government affiliates. Outside of FLEC, a substantial swath of the Cabindan population engages in peaceful demonstrations against Angolan rule. This widespread sympathy to the independence movement apparently renders many Cabindans subject to arbitrary human rights violations in Angola's attempts to cow the province, with disappearances, torture, and intimidation routine.

Ndudzi's basic allegation is that the Angolan government identified her as a supporter of the independence movement after she attended a church-organized, pro-independence rally in 2016. Soon thereafter, three armed men in government uniforms broke into her home and, in front of her

No. 20-60782

children, beat and raped her, leading to a three-day hospital stay. Ndudzi claimed, in her asylum application and in sworn testimony before an IJ, that she was never formally a member of FLEC, but rather has only supported independence through peaceful protest and organizing, which is a family tradition of sorts for many Cabindans. However, the IJ interpreted unsworn, nonverbatim statements from Ndudzi's credible fear interview (CFI) as indicating that Ndudzi was a member of FLEC. The immigration judge then concluded that Ndudzi only sought to distance herself from FLEC after learning that it might be deemed a terrorist organization.[1] That perceived inconsistency, along with varying statements Ndudzi gave about her preferred language and the color uniforms her attackers wore, led the IJ to deem Ndudzi not credible, which in turn formed the main basis for the IJ denying Ndudzi's asylum, removal withholding, and CAT claims. The BIA found this adverse credibility finding reasonable, and affirmed. Now, the main issue in this petition for review is whether, under our deferential standard of review, the record compels a finding that Ndudzi is credible.

II.

This is a petition for review of a BIA final order dismissing Ndudzi's claim for asylum, withholding of removal, and protection under the CAT.

---

[1] The United States has not officially labeled FLEC a terrorist organization. In addition to denying Ndudzi's petition on an adverse credibility finding, the IJ also concluded, based on the adverse credibility finding, that Ndudzi is a member of FLEC and that FLEC is a terrorist organization, relying almost exclusively on the Fourth Circuit's decision in *Viegas v. Holder*, 699 F.3d 798 (4th Cir. 2012). *See* 8 C.F.R. § 1208.16(d)(2). The BIA did not rely on this holding, instead affirming on the IJ's adverse credibility ruling. Ndudzi therefore does not seek review of the IJ's finding that FLEC is a terrorist organization. Indeed, because the BIA did not reach the IJ's finding that FLEC is a terrorist organization, this court lacks jurisdiction to review that finding. *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007).

No. 20-60782

The BIA had jurisdiction under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15, and we have jurisdiction under 8 U.S.C. § 1252(b).

Under the Immigration and Nationality Act (INA), the Attorney General has discretion to grant asylum to an alien who is a "refugee." *Milat v. Holder*, 755 F.3d 354, 360 (5th Cir. 2014); 8 U.S.C. § 1158(b)(1)(A). A "refugee" is a person "unable or unwilling to return" to the person's home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). At this stage of the proceedings, there does not appear to be any real dispute that if Ndudzi's allegations are true, she could qualify as a refugee.

We generally have "authority to review only the decision of the BIA." *Zhu v. Gonzales*, 493 F.3d 588, 593 (5th Cir. 2007). However, we may also review the IJ's decision if "the IJ's ruling affects the BIA's decision." *Id.* The BIA adopted the IJ's factual findings, including the key finding that Ndudzi was not credible. We may therefore review the IJ's adverse credibility finding. *See Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020).

We review factual findings under the substantial evidence standard and legal questions de novo. *Zhu*, 493 F.3d at 594. Under the substantial evidence standard, reversal is improper "unless we decide not only that the evidence supports a contrary conclusion, but that the evidence *compels* it." *Zhao v. Gonzales*, 404 F.3d 295, 306 (5th Cir. 2005) (internal quotation marks and citation omitted). Ndudzi "must prove that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion." *Id.*

III.

The main issue in this appeal is whether the BIA erred in upholding the IJ's adverse credibility finding. That decision is largely based on perceived contradictions between Ndudzi's alleged statements in her CFI

4

No. 20-60782

and her sworn testimony in her removal hearing. Ndudzi makes two arguments against the adverse credibility finding. First, she argues that the BIA and IJ improperly relied on the CFI notes, which consisted of non-verbatim translations of her responses to questions, and to which Ndudzi did not contemporaneously swear or attest, although she did attest to a summary of the interview. Second, she argues that substantial evidence does not support the adverse-credibility decisions. We decline to address the CFI notes' admissibility because, even if those notes were properly admitted, they do not support the conclusions the Agency drew from them.

The INA provides that, "[c]onsidering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's . . . written and oral statements . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." 8 U.S.C. §1158(b)(1)(B)(iii). "[I]t is the factfinder's duty to make determinations based on the credibility of the witnesses," but an adverse credibility determination must be based in "specific and cogent reasons derived from the record." *Singh v. Sessions*, 880 F.3d 220, 225 (5th Cir. 2018) (internal quotation marks and citation omitted). The factfinder may rely on any inconsistency or omission to determine that the petitioner is not credible in light of the totality of the circumstances, regardless of whether the inconsistency or omission goes to the heart of the applicant's claim. *Ghotra v. Whitaker*, 912 F.3d 284, 289 (5th Cir. 2019); 8 U.S.C. § 1158(b)(1)(B)(iii). We defer to "an IJ's credibility determination unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Singh*, 880 F.3d at 225 (internal quotation marks and citation omitted).

The Agency concluded that contradictions between the CFI notes and Ndudzi's testimony rendered her testimony incredible. Specifically, the IJ

5

found that Ndudzi was not credible based on: "inconsistencies between issues surrounding the language she speaks best, her FLEC membership, and her inconsistencies with recalling certain aspects of her asylum interview but then specifically not remembering making certain statements when it was against her interest." According to the IJ, the more "complex" inconsistencies pertained to Ndudzi's membership in FLEC. The IJ cited the CFI notes' statement that Ndudzi claimed she was "part of the group that fights for independence of [Cabinda]," while at the merits hearing and in her asylum application she claimed that she never belonged to FLEC. The IJ interpreted the CFI notes as depicting that Ndudzi claimed FLEC membership, and thus her denial of FLEC membership at the asylum hearing was a disingenuous attempt to save her asylum claim. The IJ also discounted Ndudzi's explanation for this purported inconsistency, which was that she meant she belongs to the Cabindan "population," which generally fights for independence from Angola. The BIA's credibility analysis, in turn, rests on its assertion that Ndudzi "provided inconsistent evidence concerning whether she was a member of [FLEC]."

The Agency's conclusion that Ndudzi expressly claimed FLEC membership is rooted in the following (non-verbatim) summary in the CFI notes:

> [Q] Why do you think the men came to your home in 2017 to harm you?
> [A] Because I was also part of the group that fights for the independence of my province.
> [Q] How did they know you were part of the group?
> [A] How do you not know? Everyone is aware of who is part of this group.
> [Q] How does everyone know?
> [A] The government, compared to those people, is not the same power.

No. 20-60782

[Q] I'm not sure I understand. You said everyone is aware of who is part of the group. How does everyone know that?
[A] Because the government is aware of the people that belong to flec [sic], it's like generations of families and even [when] they die, they pass it along. The government knows who belongs to this group.
[Q] What does [FLEC] stand for?
[A] It's the rebel group that fights for the independence of Cabinda.
[Q] Did you ever use violence as part of your activities in the group?
[A] No.

The CFI notes also state that Ndudzi feared an attack if she returned to Angola "Because I know that my husband is on the list for this group and I belong to the group and I'm his family. I know they would come after me too and I don't want to die and leave my kids behind." The IJ and BIA interpreted these notes as reliably indicating that Ndudzi had claimed FLEC membership. When asked directly about it, under oath and in a transcribed hearing, Ndudzi repeatedly denied ever having been a FLEC member or having said she was a member, but the IJ and BIA concluded that Ndudzi was lying, inferring that she'd learned from counsel that FLEC membership could hinder her asylum application. There are two problems with this conclusion. First, the purported "inconsistencies" between the CFI notes and Ndudzi's sworn testimony are in fact largely consistent. Second, the Agency failed to consider Ndudzi's corroborating evidence. That is, when faced with seeming inconsistencies between the CFI notes and Ndudzi's sworn testimony, the Agency not only declined to credit Ndudzi's sworn testimony, it accepted as true the CFI notes' unsworn, non-verbatim statements while ignoring evidence to the contrary. *Cf. Nkenglefac v. Garland*, 34 F.4th 422 (5th Cir. 2022) (vacating a BIA decision affirming an adverse credibility finding, which was based on purported inconsistencies

7

between sworn testimony and CFI statements, because the petitioner "was not given the opportunity to explain perceived inconsistencies in the government summaries of his prior uncounseled interviews"); *Ferreira v. Lynch*, 831 F.3d 803, 809-11 (7th Cir. 2016) (remanding to the BIA when it failed to consider whether "the notes from the credible-fear interview are unreliable because . . . they are a summary and not a verbatim transcript"); *Bassene v. Holder*, 737 F.3d 530, 537 (9th Cir. 2013) (noting that even "a contradiction between a petitioner's asylum interview, where the interview was not recorded and notes were taken by hand, and removal hearing testimony [alone may not be] substantial evidence to justify an adverse credibility finding").

## A.

We first examine whether the Agency correctly found Ndudzi's statements to be inconsistent. The primary inconsistency, according to the Agency, is that Ndudzi claimed FLEC membership in the CFI but disavowed FLEC membership under oath at her subsequent merits hearing. However, the CFI notes don't include any direct statement by Ndudzi that she "belongs" to FLEC, and the CFI officer never directly asked Ndudzi whether she is a member of FLEC. She mentions FLEC only in response to the interviewer's question; otherwise she just says that she was "part of the group that fights for [Cabinda's] independence." The closest she gets to saying that she is a member of FLEC is when, in response to a clarifying question after she says that the government knows the names of all Cabindans who fight for independence, "the government is aware of the people that belong to FLEC," because FLEC membership is defined by familial lines and because the Angolan government freely labels independence supporters as FLEC members to discredit them. That is not a direct or implied admission of FLEC membership, just a statement that the Angolan government tracks families with FLEC members. In other words, Ndudzi never claims FLEC

membership in the CFI notes, and there is no express inconsistency in Ndudzi's statements regarding FLEC.

For what appeared to be an inconsistency between her statements at the CFI interview and at the merits hearing, Ndudzi offered an explanation. She said that the Angolan government presumes that anyone who supports Cabindan autonomy is a member of FLEC and thus subject to arrest. She also offered expert opinion that FLEC is outlawed in Cabinda such that there is no formal membership, and that a common Cabindan saying is "We are all FLEC." And there is no evidence that Ndudzi ever engaged in any measures beyond attending a rally and organizing her neighbors. Ndudzi's partner similarly avowed that she was never a member of FLEC, and instead had engaged in pro-independence demonstrations organized by her church. Ndudzi thus related only peaceful, non-FLEC-related independence campaigning, something shared by various Cabindan civil society actors like churches, academics, and journalists. Thus, the IJ and BIA first identified an "inconsistency" that wasn't inconsistent, and then decided to weigh Ndudzi's inferred statement from a non-verbatim report, to which she had not specifically attested, over the more formal record evidence and sworn testimony to the contrary. On this point, it should be noted that the BIA acknowledged that, "except for [her] denial that she was a member of the FLEC, her hearing testimony was largely consistent with her credible fear testimony." Thus, the main pillar of the adverse credibility determination is not "supported by specific and cogent reasons derived from the record.'" *Singh*, 880 F.3d at 225 (quoting *Wang v. Holder*, 569 F.3d 531, 537 (5th Cir. 2009)).

The BIA then cited other reasons in support of its adverse credibility finding. It determined that Ndudzi made an inconsistent statement about whether she entered the United States alone or with two of her children. But this conclusion is also questionable. Before the merits hearing, Ndudzi

claimed that she entered the United States with two children, while her partner separately entered with their third child. She also said that the reason they did not all enter together was that she and two of her children were kidnapped in Mexico for ransom, and were released only when her kidnappers decided that no one would pay for her release. At the merits hearing, Ndudzi said that she traveled from Panama to the United States with her partner and their children. When asked if she entered the United States "with all those family members," she responded:

> When we arrived in Mexico, we wanted to continue traveling and crossing together. But due to the fact that I was kidnapped in Mexico, I wasn't able to go with the rest of my family. So the people who kidnapped me thought I was from Central America. But when I told them I'm from Africa, they did not harm me. When I arrive[d] at the border with Immigration, they told me that my . . . partner had already crossed.

While the BIA interpreted this answer as stating that Ndudzi entered the United States "alone," she never actually said that; she only said that her family did not all enter together.

The IJ and BIA next relied on Ndudzi's inconsistent statements about what language she speaks best. She told the credible fear interviewer that she prefers Portuguese, but she told the IJ that she prefers French. It is true that these statements conflict, though it should be noted that, earlier, the government's Portuguese interpreter—who spoke European Portuguese— had difficulty understanding Ndudzi's African dialect. Ndudzi's desire to forego Portuguese in favor of French is thus understandable.

Last, the IJ and the BIA noted inconsistencies in Ndudzi's statements about what kind of uniforms her attackers wore. At the hearing, Ndudzi stated that the three men wore "military uniform[s]," while in her asylum affidavit she says they wore "Angolan black police uniforms." This is trivial

difference, as there is nothing in the record that indicates Angolan "military uniforms" are not black or are different from "police uniforms." We have held that trivial or unimportant details may support an adverse credibility decision. *See Avelar-Oliva*, 954 F.3d at 768. But here there were two corroborating statements—one from Ndudzi's partner and one from the child advocate working with Ndudzi's child who witnessed the rape—corroborating Ndudzi's assertion that she was raped by three men representing the Angolan government to intimidate her from continuing to demonstrate for Cabindan independence.

In summary, none of the inconsistencies the Agency relied on are in fact inconsistent. That leaves only the IJ's opinion that Ndudzi's demeanor was "agitated," including when asked about "being separated from her children" for over a year, as evidence she was not credible. We generally defer to an IJ's perception of an asylee's demeanor.[2] *E.g.*, *Wang*, 569 F.3d at 539. But we have never held that demeanor alone supports an adverse credibility finding where the Agency failed to consider an asylee's

---

[2] Such deference is perhaps unfounded, however, given the wealth of contemporary psychological research suggesting that subjective perception of a witness' demeanor is an unreliable indicator of the witness' veracity. *E.g.*, Mark W. Bennett, *Unspringing the Witness Memory and Demeanor Trap: What Every Judge and Juror Needs to Know about Cognitive Psychology and Witness Credibility*, 64 AM. U. L. REV. 1331, 1332 (2015) ("[C]ognitive psychological studies have consistently established that the typical cultural cues jurors rely on, including averting eye contact, a furrowed brow, a trembling hand, and stammering speech, for example, have little or nothing to do with a witness's truthfulness."); Liz Bradley & Hillary Farber, *Virtually Incredible: Rethinking Deference to Demeanor When Assessing Credibility in Asylum Cases Conducted by Video Teleconference*, 36 GEO. IMMIGR. L.J. 515, 535 (2022) ("Decades of research by social scientists have shown that the nonverbal 'cues' commonly associated with deception are based on false assumptions," and cultural differences between an asylee and an IJ can "lead to cross-cultural misunderstandings of nonverbal cues," especially when testimony is mediated through an interpreter).

corroborating evidence. *Cf. In re A-S-*, 21 I. & N. Dec. 1106, 1112 (BIA 1998). (suggesting that it may be inappropriate to base an adverse credibility finding solely on "halting and hesitating testimony" if that testimony is detailed and consistent); *In Re B-*, 21 I. & N. Dec. 66, 70 (BIA 1995) (reversing denial of asylum that was based solely on demeanor).

B.

That brings us to the last issue with the Agency's adverse credibility analysis. The BIA relied only on the above-mentioned "inconsistencies" to discount Ndudzi's claims, while failing to consider documentary evidence that bolstered her claims. Where an asylee offers insufficient supporting evidence, an adverse credibility finding suffices to deny an asylum claim. *E.g.*, *Zhang*, 432 F.3d at 345. This court "reviews the BIA's decision procedurally to ensure that the complaining alien has received full and fair consideration of all circumstances that give rise to his or her claims." *Ghotra*, 912 F.3d at 290 (internal quotation marks, citation, and alteration marks omitted). The BIA must "consider the issues raised, and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Id.* Remand is not "warranted any time the BIA does not discuss every piece of corroborating evidence." *Id.* But remand may be necessary where the BIA "failed to address much of [the] key evidence." *Abdel-Masieh v. INS*, 73 F.3d 579, 585 (5th Cir. 1996).

Ndudzi submitted declarations from her partner, Kevin Tchissambo; two experts on Angola and Cabinda; a child support advocate discussing Ndudzi's children's diagnoses of post-traumatic stress disorder from witnessing Ndudzi's rape; and corroborating country condition information. The BIA's opinion did not cite any of this corroborative evidence, instead resting its decision on the CFI notes' description of Ndudzi's statements. And while the IJ noted Ndudzi' evidence in describing her petition's factual

background, the IJ also considered only Ndudzi's non-verbatim CFI statements to assess the credibility of her sworn hearing testimony.

In sum, the BIA and IJ's adverse credibility determination rests largely on "inconsistencies" in the record that are not actually inconsistent. True, small inconsistencies, when added up, could support an adverse credibility finding. *Cf. Avelar-Oliva*, 954 F.3d at 768. But here each purported inconsistency does not actually undercut Ndudzi's claim, and the BIA ignored Ndudzi's corroborating evidence. That demonstrates that the Agency did not support its finding with "specific and cogent reasons derived from the record." *Zhang v. Gonzales*, 432 F.3d 339, 344 (5th Cir. 2005). *Cf. Cuesta-Rojas v. Garland*, 991 F.3d 266, 277 (1st Cir. 2021) ("Here, we are explaining why the record does not support finding any of these inconsistencies to be concerning at all, such that their amalgamation necessarily cannot be of concern.").

## IV.

Last, Ndudzi challenges the Agency's denial of her CAT claim. The same defects noted above also apply to the Agency's denial of Ndudzi's CAT claim, but with more force: whereas an adverse credibility finding is often fatal to an asylum petition, the CAT regulations specifically require the Agency to consider a petitioner's corroborating evidence even if the petitioner has been deemed not credible.

Whether a petitioner is eligible for CAT protection is a factual question that we review under the substantial evidence standard. *Zhang*, 432 F.3d at 344. To obtain protection under the CAT, Ndudzi "must demonstrate that, if removed to a country, it is more likely than not [s]he would be tortured by, or with the acquiescence of, government officials acting under the color of law." *Hakim v. Holder*, 628 F.3d 151, 155 (5th Cir. 2010) (citing 8 C.F.R. § 208.16(c)(2)). Torture under the CAT is defined as:

No. 20-60782

> any act by which severe pain or suffering, whether physical or
> mental, is intentionally inflicted on a person for such purposes
> as obtaining from him or her or a third person information or a
> confession, punishing him or her for an act he or she or a third
> person has committed or is suspected of having committed, or
> intimidating or coercing him or her or a third person, or for any
> reason based on discrimination of any kind, when such pain or
> suffering is inflicted by or at the instigation of or with the
> consent or acquiescence of a public official or other person
> acting in an official capacity.

8 C.F.R. § 208.18(a)(1); *see* 8 C.F.R. § 208.16(c)(1).

The IJ concluded that Ndudzi is ineligible for CAT relief because of her connection to FLEC. That conclusion, in turn, is based principally on the IJ's adverse credibility finding. Thus, the IJ's denial of Ndudzi's CAT claim rests almost entirely on the adverse credibility determination. Before the BIA, Ndudzi contended that the IJ "relied too heavily on the adverse credibility finding," but the BIA disagreed, construing the IJ as merely decreasing the weight of Ndudzi's testimony regarding her fear of torture. The BIA then affirmed the IJ on the merits, stating only that Ndudzi "has not shown that the Angolan government is searching for her, that she will be specifically targeted and tortured, or that she would not be able to relocate safely within Angola." The BIA did not address Ndudzi's supporting evidence, but it did note that the IJ considered evidence of general conditions in Angola.

The BIA mischaracterized the IJ's decision, which did in fact rely heavily on the adverse credibility determination because the IJ denied the CAT claim "[a]t the outset . . . because the Court's adverse credibility finding taints the CAT claim." Ndudzi's claims for asylum and CAT relief rely on identical factual bases, and thus the adverse credibility finding, if upheld, will similarly doom Ndudzi's CAT claim. *Cf. Asres v. Holder*, 364 F.

App'x 127, 131 (5th Cir. 2010). But the Agency's almost-exclusive reliance on the adverse credibility finding to deny Ndudzi's CAT claim faces two problems. First, as discussed above, the record does not specifically support that finding. Second, the BIA did not consider Ndudzi's corroborating evidence in denying her CAT claim. The applicable regulation, 8 C.F.R. § 1208.16(c)(3), requires the BIA to consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and any "[o]ther relevant information regarding conditions in the country of removal" in its likelihood-of-torture assessment. "That provision has no exception for cases of adverse credibility determinations." *Arulnanthy*, 17 F.4th at 598.

The BIA, however, only noted what the IJ had considered—a country-conditions report—and then, like the IJ, did not meaningfully consider anything else. "Generalized country evidence tells [courts] little about the likelihood state actors will torture any particular person," *Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019), and Ndudzi also introduced more specific evidence. Her experts described the Angolan government's pattern of human rights violations against pro-independence Cabindans like Ndudzi. Her experts also specifically opined that Ndudzi was likely to be tortured or killed on her return to Angola. They noted that the Angolan government closely monitors Angolans who return after unsuccessfully seeking asylum in other countries, and Ndudzi's partner related receiving a message from an Angolan phone number threatening that the government would find him and his family if he returned to Angola. The IJ somewhat engaged the expert affidavits, which it discounted by finding that imprisonment does not equate with torture. But the IJ did not mention the experts' opinion that the Angolan government would also rape or murder Ndudzi. Finally, while the IJ deemed Ndudzi's fears "speculative," this court has distinguished between "speculation that government officials may be willfully blind to [a

No. 20-60782

petitioner's] likely future torture" and assertions that government officials were "previously actually involved in or enabled" past torture and were "likely to be involved again in the future." *Garcia v. Holder*, 756 F.3d 885, 892-93 (5th Cir. 2014). As in *Garcia*, Ndudzi alleges that government agents tortured her. That allegation, along with the corroborating evidence of the Angolan government's similar treatment of other pro-independence activists, satisfies our standards for a credible fear of torture. *Cf. id.* ("The alleged active involvement of public officials acting in their official capacity and the close temporal proximity between Garcia's contact with public officials and the subsequent threats and beatings support his assertions and warrant further review.").

V.

In summary, the BIA and IJ relied heavily on an unsupported conclusion that Ndudzi is not a credible witness. At the same time, there appears to be little dispute that, if Ndudzi's claims are true, she would be entitled to asylum under 8 U.S.C. § 1158(b)(1)(A). Because the adverse credibility finding is not supported by specific and cogent reasons derived from the record, we GRANT the petition for review, VACATE the decisions of the BIA and IJ denying Ndudzi's application for asylum and CAT relief, and REMAND for further proceedings consistent with this opinion.