# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 8, 2021

Lyle W. Cayce
Clerk

No. 19-60760

Jeevithan Arulnanthy,

*Petitioner*,

*versus*

Merrick Garland, U.S. Attorney General,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals
BIA No. A215 947 323

Before Jolly, Haynes, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

The question presented is whether Jeevithan Arulnanthy is entitled to asylum and relief under the Convention Against Torture. We deny the petition on the first ground and remand on the second.

## I.

Petitioner Jeevithan Arulnanthy grew up in Sri Lanka as part of that country's Tamil ethnic minority. He left in June 2018 and entered the United States through the Mexican border in September. Immigration officials apprehended Arulnanthy within hours of his arrival and determined that he

had entered the country illegally. So they detained him in anticipation of removal proceedings.

Three weeks later, an asylum officer conducted a credible-fear interview. 8 U.S.C. § 1225(b)(1)(B). Arulnanthy stated during the interview that he feared returning to Sri Lanka based on two encounters with the Criminal Investigation Department ("CID") of the Sri Lanka Police. The first took place on January 3, 2018, after CID officials discovered that Arulnanthy was planning to participate in a local election as a member of the Tamil National Alliance Party. Arulnanthy explained that the officials "came to [his] home," "took [him] to their office," and "kept [him] for two days and beat [him]" while telling him he "should not contest the election and [should] not be involved in public issues." The second encounter took place on May 19, 2018, after Arulnanthy attended a "memorial function" the previous day. Arulnanthy told the asylum officer that CID officials once again came to his house but found only his mother there. The asylum officer ended the interview by asking Arulnanthy if he would like to alter or add to his statement and if there was anything else of import that they had not yet discussed. Arulnanthy responded "No" to both questions. The asylum officer determined that Arulnanthy had established a credible fear of persecution based on his political opinion as a supporter of the Tamil National Alliance Party.

Soon thereafter, the Department of Homeland Security issued a Notice to Appear alleging that Arulnanthy was subject to removal for entering the country at an impermissible location and without the required documentation. *See* 8 U.S.C. § 1182(a)(6)(A)(i), (7)(A)(i)(I). Arulnanthy conceded the charges against him, and the immigration judge ("IJ") found him removable. Arulnanthy indicated that he intended to apply for asylum and withholding of removal under the Immigration and Nationality Act

("INA"), along with relief under the Convention Against Torture ("CAT").

Arulnanthy asked the Justice Department for relief in February 2019. When asked to explain why he feared torture and or other harm upon his return to Sri Lanka, Arulnanthy mentioned his past encounters with the CID, his Tamil ethnicity, and his political activity. Like his credible-fear interview, Arulnanthy's application included a summary of his January 3 and May 19 encounters with the CID. His description of the January 3 incident remained largely the same. But a central detail about the May 19 incident was different: Though Arulnanthy had previously asserted that CID officials spoke with his mother on that date after finding him absent, he now stated that the officials visited his home and "question[ed] [him]" directly about his participation in the memorial service. Arulnanthy also mentioned a CID run-in he hadn't before—namely, that "[o]n May 10, 2018, the CID came to my house again and . . . w[ere] talking to my mother . . . so I ran from the back door and went to my relative's house."

Arulnanthy testified in support of his application at a hearing before the IJ a few months later. Regarding his experience on January 3, Arulnanthy said the CID visited his home and "asked [him] to come to the CID office"— and that he voluntarily did so. The Government highlighted on cross-examination the inconsistency between that testimony and Arulnanthy's prior statement (in his credible-fear interview) that the CID "took him with them." Regarding the May 10 incident first mentioned in his asylum application, Arulnanthy repeated that he ran to his aunt's house after hearing CID officers conversing with his mother. And regarding the May 19 encounter, Arulnanthy testified that CID officers returned to his house and personally threatened him for attending the memorial service.

Arulnanthy submitted documentary evidence at the hearing to further support his application. Some of this evidence pertained to his past encounters with the CID. But much of it involved the general country conditions in Sri Lanka—and in particular, the situation facing many Tamils living there.

The IJ reviewed Arulnanthy's application and evidence and determined he was not entitled to relief. The IJ found that Arulnanthy was not a credible witness based on three omissions and discrepancies. First, Arulnanthy testified to the IJ that CID officers visited his home on January 3 and that he went to their office on his own. But he said in his credible-fear interview that they took him to the office against his will. Second, Arulnanthy testified that the next time he encountered the CID was on May 10 when officers visited his home and spoke with his mother. But he never mentioned this event in his credible-fear interview. Finally, Arulnanthy told the IJ that CID officers personally spoke with and threatened him on May 19 after he attended the memorial service. But he told the asylum officer conducting the credible-fear interview that he was not home for that incident and only heard about it from his mother.

Arulnanthy appealed to the Board of Immigration Appeals ("BIA") on several grounds. Mainly, he contended the IJ failed to consider Arulnanthy's background evidence on country conditions. That mattered for asylum purposes, he said, because the country reports showed a "pattern or practice . . . of persecution" of Tamils. *See* 8 C.F.R. § 1208.13(b)(2). And it mattered for CAT purposes because the IJ had a regulatory obligation to consider "all evidence relevant to the possibility of future torture," including "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "other relevant information regarding conditions in the country of removal." *See* 8 C.F.R. § 1208.16(c)(3). Arulnanthy also argued that the IJ's credibility assessment was erroneous, specifically

because of the IJ's treatment of Arulnanthy's testimony regarding the January 3 and May 10 incidents. Arulnanthy did not mention his testimony about what happened on May 19. Nor did he challenge the IJ's finding that his testimony of past persecution was insufficiently corroborated.

The BIA dismissed Arulnanthy's appeal. It upheld the IJ's credibility and corroboration determinations because, it said, they were based on the totality of the circumstances and not clearly erroneous. Given that holding, it followed that Arulnanthy could not carry his burden of credibly establishing past persecution for asylum purposes. As to his fear of both future persecution (asylum) and future torture (CAT), the BIA noted Arulnanthy's reliance on general country-conditions evidence regarding Sri Lanka. But it refused to consider that evidence because "the Immigration Judge's adverse credibility finding is dispositive and is fully supported by the record, and we see no reason to disturb it." Since the BIA did not find the IJ's adverse credibility finding clearly erroneous, it "decline[d] to address the [IJ's] alternate bases for denying relief in this case."

Arulnanthy filed a timely petition for review with this court. He then filed an emergency motion for a stay of removal, which our court denied. The Government has since indicated that, on January 28, 2020, it removed Arulnanthy from the United States. We review the BIA's decision, and we review the IJ's decision only to the extent it influenced the BIA. *Tibakweitira v. Wilkinson*, 986 F.3d 905, 910 (5th Cir. 2021). We review the BIA's legal conclusions, along with the legal question of our own jurisdiction, *de novo*. *See ibid.* But we review the BIA's factual findings, including adverse credibility findings, only for substantial evidence. *Ibid.*; *Wang v. Holder*, 569 F.3d 531, 540 (5th Cir. 2009). Substantial evidence supports a decision unless "the evidence is so compelling that no reasonable fact finder could fail to find the petitioner statutorily eligible for relief." *Mirza v. Garland*, 996 F.3d 747, 752 (5th Cir. 2021) (quotation omitted). But we cannot affirm a decision that

"fail[s] to address key evidence." *Cabrera v. Sessions*, 890 F.3d 153, 162 (5th Cir. 2018) (quotation omitted); *see also Abdel-Masieh v. INS*, 73 F.3d 579, 585 (5th Cir. 1996) ("While we do not require that the BIA address evidentiary minutiae or write any lengthy exegesis, its decision must reflect meaningful consideration of the relevant substantial evidence supporting the alien's claims." (quotation omitted)).

## II.

"[J]urisdiction is always first." *United States v. Shkambi*, 993 F.3d 388, 389 (5th Cir. 2021) (quotation omitted). The Government points out that Arulnanthy's removal to Sri Lanka raises a jurisdictional question because Congress gave us jurisdiction to review "a final order of removal." 8 U.S.C. § 1252(a)(1). "In cases challenging [such an order], the petitioner's removal from the United States generally renders the petition moot." *Mendoza-Flores v. Rosen*, 983 F.3d 845, 847 (5th Cir. 2020); *see also FDIC v. Belcher*, 978 F.3d 959, 961 n.1 (5th Cir. 2020) ("[M]ootness is a jurisdictional question."). We've nonetheless held that a petitioner's removal doesn't moot his petition for review when "the petitioner would suffer collateral legal consequences from the challenged decision." *Mendoza-Flores*, 983 F.3d at 847.

Under our precedent, Arulnanthy's petition is not moot. Arulnanthy was ordered removed under 8 U.S.C. § 1229a. *See id.* § 1229a(a)(3) (establishing § 1229a as the default provision governing removal proceedings). Thus, if we uphold the BIA's removal order, Arulnanthy will suffer an automatic "period of inadmissibility following removal." *Mendoza-Flores*, 983 F.3d at 847; *see also* 8 U.S.C. § 1182(a)(9)(A)(i) (requiring an alien "who has been ordered removed . . . at the end of proceedings under [8 U.S.C. §] 1229a . . . initiated upon the alien's arrival in the United States" to wait five years before seeking readmission). This automatic waiting period is

a "concrete disadvantage" that is "imposed as a matter of law." *Alwan v. Aschroft*, 388 F.3d 507, 511 (5th Cir. 2004) (quotation omitted). It therefore qualifies under our precedent as a collateral legal consequence that preserves the justiciability of Arulnanthy's petition for review. *Mendoza-Flores*, 983 F.3d at 847; *see also Max-George v. Reno*, 205 F.3d 194, 196 (5th Cir. 2000) (so holding for a removal order that triggered the similar 10-year waiting period in 8 U.S.C. § 1182(a)(9)(A)(ii)), *vacated on other grounds by Max-George v. Ashcroft*, 533 U.S. 945 (2001) (mem.).

## III.

Because Arulnanthy's petition isn't moot, we turn now to the merits. Arulnanthy first argues the IJ erroneously rejected his asylum application. We begin with the IJ's adverse credibility finding, which we find is supported by substantial evidence. Then we turn to the impact of that adverse credibility finding on Arulnanthy's asylum claim and find the claim meritless.[1]

## A.

We review an adverse credibility finding for substantial evidence and must uphold it "unless it is clear[] from the totality of the circumstances" that a "reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Morales v. Sessions*, 860 F.3d 812, 817 (5th Cir. 2017) (quotation omitted). Adverse credibility determinations "must be supported by specific and cogent reasons derived from the record." *Singh v. Sessions*, 880 F.3d 220, 225 (5th Cir. 2018) (quotation omitted). But

---

[1] In his briefing, Arulnanthy fails to assert, and therefore abandons, any challenges to the BIA's denial of withholding of removal. *See, e.g.*, *Soadjede v. Ashcroft*, 324 F.3d 830, 833 (5th Cir. 2003) (holding that petitioners abandon all arguments not raised before the court).

the reasons provided need not "go[] to the heart of the applicant's claim." 8 U.S.C. § 1158(b)(1)(B)(iii); *accord Ghotra v. Whitaker*, 912 F.3d 284, 289 (5th Cir. 2019). Rather, "an IJ may rely on *any* inconsistency or omission . . . so long as the totality of the circumstances establishes that an asylum applicant is not credible." *Wang*, 569 F.3d at 538 (quotation omitted). This includes inconsistencies and omissions that arise when comparing an applicant's statements in a credible-fear interview to his testimony at an immigration hearing. *Singh*, 880 F.3d at 226; *see also* 8 U.S.C. § 1158(b)(1)(B)(iii) (permitting the factfinder to base a credibility determination on "the consistency between the applicant's . . . written and oral statements" and "other evidence of record"). Finally, "[n]either an IJ nor the BIA is required to accept a petitioner's explanation for the plain inconsistencies in her story." *Morales*, 860 F.3d at 817 (quotation omitted).

The IJ and the BIA provided three specific, cogent, and record-based reasons for disbelieving Arulnanthy's testimony. First, Arulnanthy told his credible-fear interviewer that CID officials took him to their office on January 3 but told the IJ that he went to the CID office on his own. Second, Arulnanthy said nothing to his interviewer about the CID's visit on May 10 but testified at length before the IJ about that encounter. Third, Arulnanthy told the interviewer that CID officials returned to his house on May 19 and spoke with his mother because he was not there, but he told the IJ that the officials spoke with and threatened him directly.

These discrepancies show that the evidence would not compel a reasonable adjudicator to find Arulnanthy's testimony credible. Arulnanthy relied on three encounters to establish past persecution and torture, and inconsistencies plagued his testimony about each of them. In that sense, the discrepancies "go[] to the heart of" Arulnanthy's claims. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). Defects of this kind aren't required to make an adverse credibility finding. *See ibid.*; *Ghotra*, 912 F.3d at 289; *cf. Morales*, 860 F.3d at

817 (suggesting that substantial evidence may not support an adverse credibility finding based on a petitioner's "fail[ure] to remember non-material, trivial details that are only incidentally related to her claim of persecution" (quotation omitted)). All the more reason to conclude that where they *do* exist, they easily constitute substantial evidence to support an adverse credibility finding.

Further, Arulnanthy completely failed to mention one of the three encounters during his credible-fear interview—an omission that likely "justifies the BIA's refusal to overturn the IJ's" credibility ruling "in and of itself." *Morales*, 860 F.3d at 817 (upholding an adverse credibility determination where the petitioner "fail[ed] to mention half of the reason that she claim[ed] to possess a well-founded fear of persecution" in her asylum application). Combine that omission with the fact that Arulnanthy "directly contradicted himself on [other] aspect[s] of his story," and Arulnanthy faces an uphill battle in opposing the agency's credibility finding. *Ghotra*, 912 F.3d at 289.

Arulnanthy offers three responses, none of which is persuasive. First, he suggests it's inappropriate for an immigration court to rely on credible-fear interview transcripts to determine credibility. *See Zhang v. Holder*, 585 F.3d 715, 724–25 (2d Cir. 2009) (explaining that credible-fear interviews "warrant . . . close examination" and that "adverse credibility determinations based on 'discrepancies' with a credible fear interview should be examined with care to ensure that they are not arbitrary"). To the extent Arulnanthy contends credibility can never be challenged by reference to a credible-fear worksheet, we have already rejected that argument. *See Singh*, 880 F.3d at 226 (relying on inconsistencies between the petitioner's credible-fear interview and his hearing testimony to uphold an adverse credibility determination). And to the extent Arulnanthy contests the reliability of his own credible-fear interview, the record belies that claim. "While the record

of the interview is a summary and not a verbatim transcript, it is clear from the record that the [asylum officer] asked follow up questions to enable [Arulnanthy] to develop his account, and there is no indication that [Arulnanthy] was reluctant to reveal relevant information or that he was unable to understand the questions asked." *Ibid.*

Second, Arulnanthy provides alternative explanations for his inconsistencies. For example, Arulnanthy asserts that it was the *asylum officer* who first suggested that CID officials "took [him] to their office" on January 3 and that he unwittingly accepted the interviewer's suggestion. But Arulnanthy did far more than simply accept a suggestion. He instead affirmatively stated that that CID officials "took [him] to their office." He also said he fully understood the asylum officer's questions and did not have anything to add or clarify at the end. Given those facts, the IJ and the BIA were not "required to accept [Arulnanthy's] explanation for the . . . inconsistencies in [his] story." *Morales*, 860 F.3d at 817 (quotation omitted).

Arulnanthy also offers alternative explanations for his discrepancies related to the May 10 and May 19 incidents. He insists that his failure to mention the CID's May 10 visit during the credible-fear interview is immaterial because his interview wasn't long enough for him to detail all the facts underlying his asylum claim. He similarly contends that "the nature of the Credible Fear Interview" excuses his statement that he "was not there" when CID officials stopped by his home on May 19. These explanations reduce to a general attack on credible-fear-interview-based credibility determinations and are unpersuasive for the reasons discussed above. Further, Arulnanthy failed to object to the IJ's treatment of the May 19 inconsistencies before the BIA. So he cannot do so now. *See* 8 U.S.C. § 1252(d)(1) (restricting judicial review of final removal orders where "the alien has [not] exhausted all administrative remedies available to the alien as of right"); *Roy v. Ashcroft*, 389 F.3d 132, 137 (5th Cir. 2004) (per curiam)

(holding that § 1252(d)(1)'s exhaustion requirement is jurisdictional and applies issue by issue).

Finally, Arulnanthy asserts that the IJ improperly rejected his attempt to corroborate his inconsistent testimony with other evidence of past persecution. *See Dayo v. Holder*, 687 F.3d 653, 657–58 (5th Cir. 2012) (finding that an alien's failure to submit reliable documentary evidence supported IJ's credibility determination). That's because, Arulnanthy contends, (1) the IJ faulted him for failing to submit a letter from his mother as corroboration without inquiring whether such evidence was reasonably available, *see* 8 U.S.C. § 1158(b)(1)(B)(ii), and (2) the IJ's reasons for discounting the corroborative letters Arulnanthy *did* submit were unpersuasive. But Arulnanthy didn't make either of those arguments before the BIA. That means the arguments are unexhausted and cannot be considered here. *See* 8 U.S.C. § 1252(d)(1); *Roy*, 389 F.3d at 137.

B.

Arulnanthy next argues the BIA wrongly treated its adverse credibility finding as dispositive of his asylum claim. To qualify for asylum, Arulnanthy must show he "is a refugee within the meaning of section 1101(a)(42)(A) of . . . title [eight]." 8 U.S.C. § 1158(b)(1)(A). That section defines "refugee" to include any person who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A); *see also* 8 C.F.R. § 1208.13(b) (asylum available to an alien who shows either "past persecution" or a "well-founded fear of *future* persecution" (emphasis added)).

More concretely, an applicant can obtain asylum relief if (1) "[t]he applicant has a [subjective] fear of persecution in his or her country of nationality" on account of a protected ground, (2) "[t]here is a reasonable

possibility of suffering such persecution if he or she were to return to that country," and (3) the applicant "is unable or unwilling to return to . . . that country because of such fear." 8 C.F.R. § 1208.13(b)(2)(i). It follows that "[t]o show a well-founded fear of persecution, an alien must have subjective fear of persecution, and that fear must be objectively reasonable." *Cabrera*, 890 F.3d at 159–60 (quotation omitted). Even so, asylum applicants who establish past persecution "shall also be presumed to have a well-founded fear of [future] persecution." 8 C.F.R. § 1208.13(b)(1).

Arulnanthy faults the BIA for treating the adverse credibility determination as dispositive of his asylum claim. After the BIA upheld the IJ's credibility determination—including specifically that Arulnanthy could not "credibly establish past persecution"—the BIA turned to his claimed fear of *future* persecution. The BIA first held Arulnanthy's failure to show past persecution meant he was entitled to no presumption that he had such a fear. *See ibid.* The BIA then held, without further analysis, that "in light of the credibility determination, he has [also] not independently carried" the burden of showing a subjective, and objectively reasonable, fear of future persecution. *See id.* § 1208.13(b)(2)(i).

We apply *de novo* review, *see Tibakweitira*, 986 F.3d at 910, and conclude the BIA was correct: The adverse credibility finding was fatal to Arulnanthy's asylum claim. That's for two reasons.

First, an asylum claim based on fear of future persecution requires *subjective* fear. *Cabrera*, 890 F.3d at 159–60; 8 C.F.R. § 1208.13(b)(2)(i). Some asylum claims are entitled to a presumption on this score based on their past persecution. 8 C.F.R. § 1208.13(b)(1). Arulnanthy, however, is not entitled to that presumption; he instead must prove his subjective fear to win his asylum claim..

Second, Arulnanthy's lack of credibility precluded him from doing so. That's because, unless the IJ or the BIA specify otherwise, an adverse credibility finding operates as a blanket rejection of *every* piece of testimony the applicant has offered. *See Wang*, 569 F.3d at 539–40 (treating credibility as a binary inquiry and discussing, among other things, "the general believability of [the alien's] story" on the way to affirming an adverse credibility finding); *Herrera Morales v. Sessions*, 860 F.3d 812, 816–17 (5th Cir. 2017) (similar); *Zhang v. Gonzales*, 432 F.3d 339, 343–45 (5th Cir. 2005) (similar). And if none of Arulnanthy's testimony is credible, Arulnanthy cannot possibly establish a subjective fear of persecution.

This global approach is the only way to make sense of the text and structure of the INA's "credibility determination" provision. 8 U.S.C. § 1158(b)(1)(B)(iii). That provision directs triers of fact to "[c]onsider[] the totality of the circumstances, and all relevant factors," when making credibility determinations. *Ibid.* It goes on to give a laundry list of considerations factfinders should consider. *Ibid.* Those include, *inter alia*, "the inherent plausibility of the . . . account," the internal consistency of the applicant's statements, the consistency of those statements with other evidence, "and any inaccuracies or falsehoods in such statements"—even those *not* going "to the heart of the applicant's claim." *Ibid.* And in the end, the factfinder arrives at a yea-or-nay "credibility determination."

Section 1158(b)(1)(B)(iii) allows an IJ (and by extension, the BIA) to make a global inference of untrustworthiness based on discrete problems with parts of an applicant's testimony. Rather than look for diamonds of truth in a rough of falsehoods, the IJ may infer from the falsity (or inaccuracy or inconsistency) of *some* testimony that *all* of an applicant's testimony is to be disregarded. *Cf. Wang*, 569 F.3d at 539 (explaining that IJs rightly rely on details "to sift honest, persecuted aliens from those who are feigning" (quotation omitted)). In short, unless an adverse credibility determination

acts as a rejection of all the applicant's testimony, it's hard to see what work § 1158(b)(1)(B)(iii) is doing.

And the statute allows IJs to base adverse credibility findings on testimonial problems that do not "go[] to the heart of the applicant's claim." § 1158(b)(1)(B)(iii). This clause is nonsense unless an adverse credibility finding can carry global effect: The clause explicitly allows an IJ to rest an entire credibility finding on "inconsistenc[ies], inaccurac[ies], or falsehood[s]" that *do not* go directly to central issues. If an adverse credibility finding is nothing more than a finding that *one particular factual claim* within the applicant's testimony is false, that makes no sense. *See W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 101 (1991) ("[I]t is our role to make sense rather than nonsense out of the *corpus juris*."). The whole idea behind the clause (and indeed, all of § 1158(b)(1)(B)(iii)) is that problems with some of an applicant's factual claims can justify a finding that all the applicant's factual claims are false—or at least not worthy of reliance and thus worthy of disregard. So we conclude that, as a general matter, an adverse credibility determination is a rejection of every part of an applicant's testimony unless the IJ or BIA say otherwise.

This case is a prime example of the yes-or-no approach to credibility. The IJ didn't cherry-pick one piece of Arulnanthy's testimony as credible and another as uncredible. The IJ instead deemed the whole story, including the "application in whole," not to be trustworthy. He explained:

> In light of the omissions and discrepancies detailed above, the Court makes an adverse credibility finding. The falsity and inconsistency of information in addition to Respondent's lack of candor and his submitted documents call into question the veracity of his testimony. The inconsistencies and omission between his testimony, his I-589, his documents submitted in

No. 19-60760

support of his application, and his application in whole undermine Respondent's application.[2]

That broad adverse credibility determination forecloses a showing of subjective fear. If *none* of Arulnanthy's testimony is taken as credible, then he could not establish a *subjective* fear of persecution.

Arulnanthy's only counterargument is that he could establish certain objective facts—such as his ethnicity and his status as an asylum-seeker—without his uncredible testimony. That's true but irrelevant. Those objective facts alone—without any reference to Arulnanthy's uncredible testimony—simply cannot establish that he *subjectively* fears future persecution. So the BIA was correct to hold that the adverse credibility finding forecloses his asylum application.

## IV.

Finally, we turn to Arulnanthy's CAT claim. And here, we agree with him. We first hold that the BIA was wrong to treat the adverse credibility determination as dispositive of his CAT claim. Then we explain the scope of our remand.

## A.

By way of federal regulation, Arulnanthy is eligible for CAT relief if he can "establish that it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

---

[2] The only sentence in the IJ's opinion suggesting anything else is the following: "While he may have a subjective fear of returning to Sri Lanka, the Court finds his subjective fear is not objectively reasonable." But this statement—already couched in "even-if" form—is from a section of the opinion that begins: "Had [Arulnanthy] been found credible the Court would still deny [his] application." So there's no reason to think the IJ found Arulnanthy's subjective-fear testimony credible.

The regulations define "torture" to include "any act by which severe pain or suffering . . . is intentionally inflicted on a person" by or with the acquiescence of a public official for informational, punitive, coercive, or discriminatory purposes. *Id.* § 1208.18(a)(1).

The CAT regulations impose specific requirements on IJs and the BIA. Though past torture is not enough for CAT relief, IJs and the BIA must consider "all evidence relevant to the possibility of future torture" when deciding whether future torture is more likely than not. *See id.* § 1208.16(c)(3)(i). They must also consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and any "[o]ther relevant information regarding conditions in the country of removal." *Id.* § 1208.16(c)(3) (listing other required considerations).

Our precedent imposes its own requirement: CAT claims are "distinct from asylum and withholding-of-removal claims and should receive separate analytical attention." *Santos-Alvarado v. Barr*, 967 F.3d 428, 436 (5th Cir. 2020) (quotation omitted); *see also Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002) (cautioning against "overreliance on an adverse credibility ruling" in the CAT context).

Here, the BIA violated the CAT regulations by ignoring Arulnanthy's hundreds of pages of evidence about country conditions in Sri Lanka. The applicable regulation, 8 C.F.R. § 1208.16(c)(3), in fact *requires* the BIA to consider "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and any "[o]ther relevant information regarding conditions in the country of removal" in its likelihood-of-torture assessment. That provision has no exception for cases of adverse credibility determinations. The BIA's decision did not even pretend to consider Arulnanthy's country-conditions evidence, much of which went to human-rights violations. That lack of consideration was error.

The Government's supposedly contrary precedents do not compel a different conclusion. First, the Government points to *Dayo v. Holder*, where we held that a lack of credible evidence "mean[t] that [the petitioner could not] show he will be tortured," and therefore "he is not entitled to relief under the CAT." 687 F.3d 653, 659 (5th Cir. 2012). Second, it points to *Efe*. There, we denied CAT relief, explaining that an adverse credibility determination rendered it "*not* more likely than not that [the petitioner] will go to prison in [his home country] and face a risk of torture." 293 F.3d at 907–08 (emphasis added). An even stronger citation (which the Government did not offer) would have been to *Ghotra v. Whitaker*, 912 F.3d 284 (5th Cir. 2019). There, also in the CAT context, we explicitly rejected a petitioner's argument that "the BIA erred by failing to discuss any of the supporting reports and articles" he had submitted to show general hostility to members of his faith and political party. *Id.* at 289–90 (quotation omitted). On the Government's view, these cases establish that there can be no CAT relief after an adverse credibility finding.

Yet in each of those cases, the adverse credibility finding was decisive only because there was no independent, non-testimonial evidence going to the likelihood of torture. The CAT claim in *Dayo* was doomed by "the same lack of evidence" that had undercut the petitioner's asylum claim, including a "lack[] [of] supporting evidence" to back up his uncredible testimony. 687 F.3d at 658–59. In *Efe*, the credibility assessment went "directly to the issue" of torture—but only because the petitioner alleged no "general atmosphere of torture in [his home country] against" members of the relevant group. 293 F.3d at 907–08. And in *Ghotra*, the petitioner "offered no explanation for how the[] materials" he provided "independently establishe[d] his eligibility for relief." 912 F.3d at 290. Here, by contrast, Arulnanthy offered non-testimonial evidence that could independently establish his entitlement to CAT relief. So the Government's cases are easily distinguishable.

## B.

None of this is to say that Arulnanthy will ultimately receive the CAT relief he seeks. It may be, for example, that his country reports fail to show harm that rises to the level of "torture." But that is not a question for this court at this stage. As the Supreme Court explained in *INS v. Orlando Ventura*:

> Within broad limits the law entrusts the agency to make the basic asylum eligibility decision here in question. In such circumstances a judicial judgment cannot be made to do service for an administrative judgment. Nor can an appellate court intrude upon the domain which Congress has exclusively entrusted to an administrative agency. A court of appeals is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry. Rather, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

537 U.S. 12, 16 (2002) (quotation omitted).

No "rare circumstances" are present here. As in *Orlando Ventura*, the law entrusts the agency with assessment of Arulnanthy's country-conditions evidence and his CAT claim in the first instance. *See* 8 C.F.R. § 1208.16(c)(4). Because the BIA did not consider that evidence or its impact on Arulnanthy's CAT claim when he asked it to, we must order the BIA to do so on remand. *See Orlando Ventura*, 537 U.S. at 16–17. A remand order is consistent with "well-established principles of administrative law" and will enable the BIA to "evaluate the evidence" and "make an initial determination" so a court can "later determine whether its decision exceeds the leeway the law provides." *Ibid.*; *see also, e.g.*, *Iruegas-Valdez v. Yates*, 846 F.3d 806, 813 (5th Cir. 2017); *Abdel-Masieh*, 73 F.3d at 585, 587.

No. 19-60760

\*     \*     \*

The collateral consequences of the BIA's order ensure that Arulnanthy's petition for review remains justiciable despite his removal to Sri Lanka. Substantial evidence supports the finding that Arulnanthy was not a credible witness. And the BIA was right to consider Arulnanthy's lack of credibility fatal to his asylum claim. But the BIA's refusal to consider his country-conditions evidence in the purely objective CAT context was error. We therefore REMAND the petition as to the CAT claim and DENY it in all other respects.