# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 27, 2023

Lyle W. Cayce
Clerk

_____

No. 21-60416

_____

Israel Bile Mboba,

*Petitioner*,

*versus*

Merrick Garland, *U.S. Attorney General*,

*Respondent*.

_____

Petition for Review of an Order of the
Board of Immigration Appeals
Agency No. A203 564 016

_____

Before Haynes and Engelhardt, *Circuit Judges*, and Saldaña, *District Judge*.[+]

Per Curiam:[*]

Israel Mboba, a native of the Democratic Republic of the Congo ("DRC"), sought asylum and protection under the Convention Against Torture ("CAT") in the United States. Finding him a non-credible witness, an Immigration Judge ("IJ") denied his application. He appealed to the

_____

[+] United States District Judge for the Southern District of Texas, sitting by designation.

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 21-60416

Board of Immigration Appeals ("BIA"), which affirmed the IJ's decision. He now petitions this court for review of the BIA decision, claiming that his due process rights were violated in the review process and that the IJ and BIA's decisions were incorrect. Additionally, in a second petition, he raises a challenge to both the propriety of a Temporary Appellate Immigration Judge's ("TAIJ") appointment and the merits of the TAIJ's decision to deny a motion to reopen.

For the reasons that follow, we GRANT the first petition as to the CAT claims and DENY the remainder of the first and all of the second petition.

## I. Factual Background and Procedural History

As a teenager in the DRC, Israel Mboba allegedly faced political persecution perpetuated by DRC police. His father and uncle, both politically active and prominently involved in their local church, were persecuted by the local police. In his hearing with the IJ, Mboba identified three specific dates on which his family was harmed or threatened by the police. Of the first such date, January 22, 2016, Mboba told the IJ that his father and uncle were arrested and beaten. Mboba also said that his aunt was pushed on that day and that she eventually died as a result. Mboba's second identified date was the day his aunt died, April 15, 2016. Mboba's family determined that same day that they would continue protesting against the government. While this was the second date Mboba identified in his application for asylum, Mboba stated during the IJ's interview that, besides his aunt, no member of his family was harmed or threatened on this day. Mboba's family continued to protest against the government but faced no further threat or harm until January 13, 2019. On that day, the police came to Mboba's house to bring a summons for his father and uncle to discuss their actions "against the work of the government." As neither were home, the police left the summons with Mboba, his cousin, and some other relations. The police also warned Mboba

No. 21-60416

that "whoever is going to get involved" in the protests, "they're going to do the same thing that we did to them"—a threat which Mboba interpreted as "promising death."

Mboba, his father, his uncle, and two of his aunts determined then that their lives were in danger. They secured passports in the DRC and fled the country. Mboba and his family arrived at a port of entry into the United States on June 9, 2019, having traveled from the DRC to Ecuador and up through Central America. As they had no entry documents, they were detained. Mboba's father was removed back to the DRC on January 8, 2020. Mboba was informed by a friend that some of Mboba's relatives heard that Mboba's father was arrested immediately upon his return to the DRC. Mboba himself filed for asylum on February 10, 2020.

In August, roughly two months after his entry into the United States, Mboba had a Credible Fear Interview ("CFI") with an asylum officer.[1] Though Mboba was found credible, the worksheet suggests that Mboba's testimony did not establish fear of persecution or torture. Alongside the worksheet in the record is an untitled document which appears to be a summary or non-verbatim transcript of Mboba's CFI. The veracity of the content in this document is, in part, at issue in this appeal. The interview was conducted in Mboba's native language, Lingala, with the aid of an interpreter. Mboba apparently listed four occasions on which his father was threatened: the first in February of 2015 (which did not come up in the IJ's interview), the next in February of 2016 (which corresponds in substance to the January 2016 event in the IJ's interview), the next on April 22, 2016 (which also corresponds in substance to the January 2016 event as described

—————————————————

[1] As Mboba notes, it is unclear who actually conducted the interview. The "Credible Fear Worksheet" states that the officer's name is Jose Soriano but the notes at issue in this appeal list an officer Girmai Kahsai.

to the IJ), and the last on January 13, 2019. In the CFI, Mboba reportedly conceded that the police never harmed him physically but said that he personally was threatened twice. He also stated that he believed he would be targeted because he was the son of his father and not because of any religious or political beliefs. He was apparently read and agreed to this summary of his testimony: "You testified that the police in Kinshshasa [sic] city in Congo harmed and threatened your father for participating in protests against the government. You testified that the police would tell you to shut up and threaten to harm you whenever they come to harm your father. You testified that you didn't report the threat to anyone in your country. You testified that you were targeted by the police because you are the son of your father. Is all of this accurate?"

The IJ on the case appears to have used this untitled document in Mboba's asylum hearing and, in any case, took issue with certain inconsistencies between Mboba's testimony in the CFI and testimony before the IJ. After confirming with Mboba that he was sure the dates given in the hearing before the IJ were correct, the IJ asked why the dates given at the hearing did not match the dates on Mboba's application for asylum. Notably, there are three sets of dates at issue in this case, no set of which matches up precisely. Mboba's application for asylum lists four dates on which he and/or his family were harmed by the DRC: January 2015, February 22, 2016, April 15, 2016, and January 13, 2019. The CFI notes contain discussions of these four dates: February 2015, February 2016, April 22, 2016, and January 13, 2019. And Mboba provided these three dates to the IJ: January 22, 2016, April 15, 2016, and January 13, 2019.

The IJ initially questioned Mboba regarding his inconsistencies relative to the application dates rather than relative to the CFI dates. The IJ also asked Mboba whether he had ever personally protested against the government, to which Mboba said no. The IJ followed up by asking why

Mboba had stated on his application that "I did protest[] against the Government." Mboba stated that he had only intended to claim that his family had protested. The IJ then questioned Mboba regarding inconsistencies between his testimony to the IJ and his testimony to the asylum officer during the CFI. For one, the IJ asked why Mboba claimed to the asylum officer that he arrived with his father and his sisters when the women were, according to Mboba's testimony before the IJ, his father's sisters. Mboba admitted to lying to the asylum officer and said his father had advised him to do so. The IJ then turned to the CFI dates and pressed Mboba on the inconsistencies: he asked Mboba why the CFI notes read that Mboba's uncle's leg was broken on April 22, and Mboba contended that he had told the asylum officer that this incident occurred on January 22. The IJ then asked why Mboba said his father was arrested on February 22, and Mboba again contended that he had stated that the arrest occurred on January 22. But when asked why he told the asylum officer that he had been threatened twice, Mboba conceded that he had lied "because I really, really need protection" and that he had never been threatened "because I was a minor." At the close of the interview, the IJ found that Mboba was not a credible witness because he "admitted lying to the asylum officer several times under oath" and because he "contradicted [his] application." The IJ also denied Mboba's CAT application because Mboba had not "established that it's more likely than not that you will be tortured in your country with your government's acquiescence or participation." Mboba indicated his intent to appeal.

Mboba appealed to the BIA. In a two-page decision, the BIA affirmed the IJ's decision "on the basis of the adverse credibility finding." Mboba filed a petition for review in this court. Mboba subsequently filed a motion to reopen with the BIA, claiming, *inter alia*, that the BIA should consider new evidence, that he was not mentally competent, and that his due process rights

were violated. A TAIJ denied the motion to reopen and Mboba filed another petition for review in this court. Both petitions are before us in this appeal.

## II. Standard of Review

As a general matter, this court "only ha[s] authority to review the BIA's decision, although we may also review the IJ's decision when it has some impact on the BIA's decision, as when the BIA has adopted all or part of the IJ's reasoning." *Enriquez-Gutierrez v. Holder*, 612 F.3d 400, 407 (5th Cir. 2010). "[T]he administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Chen v. Gonzales*, 470 F.3d 1131, 1134 (5th Cir. 2006) ("Under the substantial evidence standard, reversal is improper unless … [t]he applicant … show[s] that the evidence is so compelling that no reasonable factfinder could reach a contrary conclusion.") (internal citation and quotations omitted). The Court reviews questions of law *de novo*. *Miresles-Zuniga v. Holder*, 743 F. 3d 110, 112 (5th Cir. 2014).

## III. The First Petition

Mboba's first petition raises several points of error with the BIA's analysis. While his due process challenges are not properly before this court, Mboba's challenge to the BIA's adverse credibility finding is reviewable, as is his challenge to the denial of his CAT claim. Each is addressed in turn.

### A. Exhaustion

At the time this appeal was filed, this court's precedent interpreted 8 U.S.C. § 1252(d)(1) to be a jurisdictional bar. The statute states in relevant part that "[a] court may review a final order of removal only if … the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). This court had previously read this to bar jurisdiction

where a petitioner "could have raised [an issue] in [a] motion to reconsider." *Ayala Chapa v. Garland*, 60 F.4th 901, 905 (5th Cir. 2023) (.

The Supreme Court disagreed. In *Santos-Zacaria v. Garland*, 143 S. Ct. 1103 (2023), the Court held that "§ 1252(d)(1)'s exhaustion requirement is not jurisdictional [and] is subject to waiver and forfeiture." *Id.* at 1116. Instead, the Court held that § 1252(d)(1) presents "a quintessential claim-processing rule." *Id.* at 1112. A recent opinion in this Circuit, duly applying this new precedent, acknowledged the reversal of *Ayala Chapa* and its predecessors and likewise established that "an alien need not file a motion for reconsideration to exhaust arguments that arise as the result of a BIA opinion." *Carreon v. Garland*, ---F.4th---, 2023 WL 4004120, at *2 (5th Cir. June 15, 2023).

Nonetheless, the government urges us to apply the exhaustion requirement in § 1252(d)(1) because "[a] claim-processing rule may be 'mandatory' in the sense that a court must enforce the rule if a party 'properly raises' it." *Fort Bend Cnty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) (alteration omitted) (quoting *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (*per curiam*)). And as the government points out, in the time since *Santos-Zacaria* was issued, two circuits have issued opinions that both cite *Santos-Zacaria* and decline to consider arguments on the basis that they were barred by § 1252(d)(1)'s claim-processing rule. *See Umana-Escobar v. Garland*, 69 F.4th 544, 550 (9th Cir. 2023) ("Because we agree with the government that Umana-Escobar failed to exhaust the alleged claim-processing violation as required under 8 U.S.C. § 1252(d)(1), we deny this portion of the petition."), *see also Odei v. Garland*, ---F.4th---, 2023 WL 4014048, at *3 n.1 (1st Cir. June 15, 2023) ("Because the government has raised the exhaustion requirement and because the petitioner failed to argue before the BIA that he was a member of some additional social group, we find that such an argument is unexhausted. We therefore decline to consider it.").

The government has consistently and timely objected to Mboba's alleged failure to exhaust certain arguments. Thus, we will apply the claim-processing requirements of § 1252(d)(1) to the extent that Mboba did, in fact, fail to exhaust his arguments.

### B. Mboba's Due Process Claims

The government contends that Mboba's arguments concerning his procedural due process rights were insufficiently processed before the BIA and that they should thus be rejected. While "[c]laims of due process violations … are generally not subject to the exhaustion requirement," this is subject to an exception "for procedural errors that are correctable by the BIA." *Roy v. Ashcroft*, 389 F.3d 132, 137 (5th Cir. 2004). *Roy* itself concerned a petitioner's claim that "his hearing before the IJ was fundamentally unfair such that it violated his due process rights … [because] the IJ failed to advise him of his rights and did not provide him with a reasonable opportunity to question his mother or to explain the dangers he would face if returned to India." *Id.* at 136. While the petitioner admitted that he had not raised these issues directly to the BIA, he "maintain[ed] that he raised them indirectly by including a discussion of the IJ's failure to elicit additional information from the applicants" *Id.* at 137. The court was unconvinced: "Although Roy's argument is couched in terms of due process, it actually concerns 'procedural error correctable by the BIA.'" *Id.* at 137 (quoting *Anwar v. I.N.S.*, 116 F.3d 140, 144 n.4 (5th Cir. 1997)).

The issue Mboba raises concerning the IJ's conduct fails according to the same analysis. In short, Mboba claims that the IJ failed to properly develop the record despite Mboba's *pro se* status. *Roy* found that a similar issue was procedural error in light of the BIA's decision in *Matter of Exame*, 18 I. & N. Dec. 303, 305 (BIA 1982), in which the BIA remanded to an IJ for a new hearing a case where the IJ "improperly denied admission of the

background evidence … and thereby precluded the applicant from making a full and fair presentation of his persecution claim." Likewise, here, had Mboba presented the BIA with this argument, the BIA could easily have remanded the case to the IJ for more fulsome questioning and development.

Moreover, this is not the type of claim for which this court has previously found that exhaustion is unnecessary. The division may be understood in terms of structural and non-structural issues. The *Roy* case presents a non-structural issue: the IJ allegedly acted inappropriately according to the system's procedural guidelines. In simpler terms, the contention in *Roy* was that the IJ had not acted in accordance with the rules. *Anwar*, on the other hand, presents a structural issue: the court there found that "a challenge to the regulations regarding the submission of briefs … is not subject to an exhaustion requirement." *Anwar*, 116 F.3d at 144 n.4. The *Anwar* petitioner was challenging the rules themselves. As the BIA cannot change these rules, exhaustion (or, in updated terms, claim-processing) is not required. Here, Mboba alleges that the IJ failed to adhere to the rules. This is the sort of challenge that the BIA is equipped to address.

The issue regarding the CFI notes is less obviously a procedural error remediable by the BIA but fails according to the same analysis. In short, Mboba suggests that the IJ and BIA's reliance on the CFI notes was reversible error as the notes are "not sufficiently reliable" to "form the basis for an adverse credibility determination." It is unclear if the BIA could remand for a new CFI; Mboba's reply brief suggests that it could not. In fact, Mboba claims (without citation) that "[t]he BIA cannot change the way credible fear interviews are conducted, or the way such 'notes' are created during that process, either in Mr. Mboba's case, or generally." That may be so, and given the absence of evidence either way we may assume as much. Nonetheless, had Mboba raised before the BIA this challenge to the IJ's reliance on the CFI notes, the BIA could have remedied the issue (if it thought it necessary)

by rejecting any findings of the IJ that relied on those notes or otherwise disclaiming reliance on the notes. The BIA was not given a chance to do so. Again, a challenge to the reliability of materials relied upon by the IJ is squarely about whether the IJ and the BIA were following the rules; one need not make a structural attack on the CFI process in order to say that certain non-verbatim notes are not reliable for purposes of impeachment.

For both issues, Mboba alternatively argues that he did, in fact, raise this issue before the BIA, albeit indirectly. Mboba contends that circuit precedent "has repeatedly set the bar low" for what constitutes raising an issue. He points to *Omari v. Holder*, in which the petitioner's failure to exhaust was contrasted with other petitioners who had "made some concrete statement before the BIA to which they could reasonably tie their claims before this court," 562 F.3d 314, 322 (5th Cir. 2009) (*abrogated on other grounds by Santos-Zacaria*, 143 S. Ct. 1103), and *Carranza-De Salinas v. Gonzales*, in which the court held that the petitioner's issue was not unexhausted because she "raised th[e] argument, although in a less developed form, before the BIA," 477 F.3d 200, 206 (5th Cir. 2007).

For the "less developed" version of his arguments, Mboba points to statements that he "appeared pro se throughout the proceedings" and that "[t]he Immigration Judge denied Mr. Mboba's application for asylum and withholding of removal based on the erroneous adverse credibility determination without engaging in any further analysis." These statements, presented in the Procedural History and Summary of the Argument sections, respectively, could not reasonably have placed the BIA on notice of the argument that the IJ failed to properly develop the record. Mboba also submits that he raised a less developed version of his argument relating to the CFI notes by stating that "[t]he Immigration Judge based his adverse credibility determination on inconsistencies between Mr. Mboba's testimony and his I-589 application and interview notes with the asylum officer." Even

under a generous interpretation of this factual statement, it is hard to see how the BIA could have understood Mboba to be challenging the veracity of those interview notes, especially given that the rest of Mboba's brief simply attempts to explain away the inconsistencies as minor or immaterial rather than claim that they did not exist in the first place.[2]

In sum, Mboba neither properly raised these issues before the BIA nor presents arguments that need not be raised before the BIA to be considered by this court. Accordingly, we apply the claim-processing rule found in § 1252(d)(1) and decline to consider Mboba's newly-raised arguments concerning the IJ's conduct and the use of the CFI notes.[3]

### C. Adverse Credibility Finding

Mboba also challenges the BIA's affirmance of the IJ's factual finding that he was not a credible witness. When evaluating the credibility of a petitioner, "an IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible .... We defer therefore to an IJ's credibility determination unless, from the totality of the circumstances, it is plain that no reasonable fact-finder could make such an adverse credibility ruling." *Wang v. Holder*, 569 F.3d 531 (5th Cir.

---

[2] It is worth noting that, while Mboba represented himself before the IJ, by the time of his appeal to the BIA he had been able to secure legal counsel. While the rules we discuss are not limited to *pro se* litigants, Mboba is not entitled to any extra-liberal construction of his BIA pleadings.

[3] While we make no judgment concerning the merits of Mboba's challenge to the CFI notes, we acknowledge that over-reliance on non-verbatim, essentially unverified notes from an interview could give rise to due process concerns. Nonetheless, as discussed in the following section, even had we thrown out all findings reliant on these notes, Mboba has not made a compelling showing of his credibility.

2009) (emphasis in original) (quoting *Lin v. Mukasey*, 534 F.3d 162, 167 (2d Cir. 2008)).

The IJ identified several inconsistencies between Mboba's application, CFI testimony, and testimony at his asylum hearing. Any one of these inconsistencies can be the basis for an adverse credibility finding. *See Ghotra v. Whitaker*, 912 F.3d 284, 289 (5th Cir. 2019) (upholding an adverse credibility ruling where the BIA identified "specific inconsistencies" and "crucial omissions" in the petitioner's testimony).

Mboba suggests that the identified inconsistencies were either minor or reliant on the CFI notes. More specifically, Mboba states that the BIA opinion only relied on two inconsistencies: (1) a discrepancy between the CFI notes and Mboba's removal hearing testimony concerning whether he personally was threatened and (2) the date when the police broke his uncle's leg. While these are the only two inconsistencies specifically identified by the BIA, Mboba's description of the first inconsistency is incomplete: the BIA identifies "clear[]" discrepancies between "the respondent's Credible Fear Interview[,] … his subsequently-filed application for asylum …[,] and his hearing testimony." In other words, even if the BIA had disregarded the CFI notes, it would still have identified issues reliant only on a comparison of the application for asylum and Mboba's testimony. In any case, the BIA's opinion provides those inconsistencies only as *examples* and not as an exhaustive list of its concerns: the BIA "affirm[ed] the Immigration Judge's denial of relief on the basis of the adverse credibility finding," which clearly indicates that the BIA relied on the entirety of the IJ's analysis.

Moreover, the IJ—and, thus, the BIA—did not rely on the CFI notes as the only or most crucial evidence of inconsistency: instead, they relied on Mboba's own testimony. As the BIA notes, "the respondent conceded at his … hearing that his Credible Fear Interview, when he told the asylum officer

that [he] had been threatened twice in his home country, was inconsistent with his testimony at his subsequent removal hearing that he [was] never directly threatened or harmed in his home country." The CFI notes were not the essential evidence of inconsistency: Mboba's own words were. The BIA's opinion refers to this exchange between the IJ and Mboba, reproduced here in relevant part:

> [IJ]: Why did you tell the asylum officer you were threatened two times in your country?
> [Mboba]: I've never been threatened physically. I was just, the threat was just mentally.
> [IJ]: In total how many times were you threatened, and how many times were you harmed in your country is what the asylum officer asked you. You responded I was threatened two times. Why would you say that when you told the Court today you were never threatened?
> [Mboba]: The thing I'm telling you today, that's the story. I've never been threatened because I was a minor.
> [IJ]: Well then why did you tell the asylum officer you'd been threatened two times?
> [Mboba]: It's because I really, really need protection. That's why I said that. But I['ve] never been threatened because I was a minor.
> [IJ]: Okay. So you lied to the asylum officer? Is that correct?
> [Mboba]: Yes, sir.

In other words: the inconsistency is not reliant on the CFI notes. Mboba admitted that he told the asylum officer that he had been threatened and that his statement was a lie. Whether or not the CFI notes are reliable, Mboba's own testimony is that he lied about a crucial element of his asylum claim to the asylum officer. This in itself is sufficient to uphold an adverse credibility determination.

We are not asked whether "we might have viewed the evidence differently" but whether "no reasonable factfinder could come to the same conclusion as the IJ." *Wang*, 569 F.3d at 540. The evidence does not compel such

a finding. Thus, we uphold the adverse credibility determination, and on that basis DENY the petition for review as to the request for asylum.

### D. Denial of CAT Relief

The BIA relied exclusively on Mboba's adverse credibility finding in order to deny his CAT application. Under our precedent, "CAT claims are 'distinct from asylum and withholding-of-removal claims and should receive separate analytical attention.'" *Arulnanthy v. Garland*, 17 F.4th 586, 598 (5th Cir. 2021) (quoting *Santos-Alvarado v. Barr*, 967 F.3d 428, 436 (5th Cir. 2020)). *See also Efe v. Ashcroft*, 293 F.3d 899, 907 (5th Cir. 2002) (warning against "overreliance on an adverse credibility ruling"). The BIA failed to give Mboba's claims the requisite analytical attention. Thus, we will GRANT Mboba's first petition as to the CAT claims and remand for further proceedings on that ground.

## IV. The Second Petition

Mboba's second petition for review challenges (1) the legitimacy of the appointment of the TAIJ who denied Mboba's motion to reopen and (2) the merits of that decision. Each is addressed in turn.

### A. Appointment of the TAIJ

Mboba's motion to reopen was considered and denied by a TAIJ. Mboba raises a challenge to the TAIJ's appointment. He claims that because the TAIJ was improperly appointed, her denial of the motion to reopen is invalid. Under 8 C.F.R. §1003.1(a)(4), the Director of the Executive Office for Immigration Review ("EOIR") has authority to "designate … temporary [BIA] members for terms not to exceed six months." These temporary board members are known as TAIJs. *Id.* The Board members more generally are "appointed by the Attorney General." *Id.* at §1003.1(a)(1).

### 1. *Exhaustion*

The government contends that Mboba's argument concerning the validity of the TAIJ's appointment was subject to the same claim-processing requirement as his other claims and was not raised in his motion to reconsider. The government thus submits that we should decline to consider Mboba's arguments on this issue. "Certainly," the government states, "one would be hard pressed to find a more suitable issue requiring exhaustion than one regarding the regulatory scheme concerning members of the [BIA]." We disagree. Mboba's arguments directly implicate structural concerns. It is absurd to suggest that Mboba should be forced to ask a TAIJ whether or not her commission is valid in order for this court to consider that question. *See Goonsuwan v. Ashcroft*, 252 F.3d 383, 389 (5th Cir. 2001) (internal quotations and citations omitted) ("Even when exhaustion is a jurisdictional bar, this Court recognizes an exception when administrative remedies are inadequate. Similarly, … where statutes impose an exhaustion requirement … [exceptions are made] where resort to the agency would be futile because the challenge is one that the agency has no power to resolve in the applicant's favor."). This accords with the decision in *Carreon*, 2023 WL 4004120 at *2, in which a similar argument was heard despite alleged failure to raise before the BIA. Mboba did not need to raise this argument before the BIA in order that we may hear it.

### 2. *Merits*

Mboba suggests that the entire TAIJ scheme is either unconstitutional or barred by relevant statutes and regulations. The BIA members, as "Inferior Officers" in the constitutional sense, must be appointed by "the President alone, … the Courts of Law, or … the Heads of Departments," as determined by Congress. U.S. CONST. Art. II, §II, Cl. II. The EOIR Director therefore cannot appoint BIA members or TAIJ members. This is

no issue in itself as it is undisputed that the Attorney General appoints TAIJs, including TAIJ Brown, who was appointed by Attorney General Merrick Garland. However, Mboba states that the regulations governing the designation of TAIJs leave "no role … for the Attorney General to make an 'appointment' of a TAIJ." As "one under investigation with a view to deportation is legally entitled to insist upon the observance of rules promulgated by the Secretary pursuant to law," *Bridges v. Wixon*, 326 U.S. 135, 153 (1945) (quoting *Bilokumsky v. Tod*, 263 U.S. 149, 155 (1923)), Mboba suggests that he can properly insist that the TAIJ scheme as a whole is invalid because the Attorney General is making appointments in the absence of regulatory or statutory authority to do so.

In addition, Mboba contends that this TAIJ's designation was invalid because Acting Attorney General Monty Wilkinson, who appointed the EOIR Director who in turn designated the TAIJ at issue in this case, was not validly in his position as Acting Attorney General. President Biden appointed Wilkinson to the post of Acting Attorney General by making use of the provisions of the Federal Vacancies Reform Act (FVRA). That act provides the "exclusive means for temporarily authorizing an acting official … for which appointment is … made by the President, by and with the advice and consent of the Senate, unless," *inter alia*, "a statutory provision expressly … designates an officer … to perform the functions and duties of a specified office temporarily." 5 U.S.C. §3347(a)(1)(B). As Mboba notes, there is such a statutory provision in play for the appointment of an Acting Attorney General. *See* 28 U.S.C. 508(b). However, that the FVRA "is not exclusive does not mean that it is unavailable." *Auth. of the President to Name an Acting Att'y Gen.*, 31 U.S. Op. Off. Legal Counsel 208 (2007). The FVRA does not, by its terms, *prohibit* use where another statute provides a mechanism for

appointment. It merely provides that it is not the only means by which an appointment may be made in such circumstances.[4]

Unfortunately, the government's brief spends very little time dealing with the merits of Mboba's claims, preferring instead to argue that Mboba's claims are unexhausted. In two lengthy footnotes, the government suggests (1) that Mboba has no standing to bring his claims, and (2) that the Attorney General properly appointed TAIJ Brown. It is not contested that the Attorney General appointed TAIJ Brown, though the propriety of that appointment is of course disputed. On standing, Mboba replies, first, that the government's arguments are waived because they were raised in footnotes,[5] and second, that the *Bridges* doctrine, described above, provides for standing. We agree with his latter contention.

Nonetheless, Mboba's argument that the TAIJ scheme is barred by regulation fails on one crucial detail: while the relevant regulations do not provide in the section on TAIJs that the Attorney General is the one to appoint TAIJs, a contextual reading of the regulations demonstrates that the Attorney General is recognized therein as the one who appoints TAIJs. Mboba suggests that language in other regulations which grants the Attorney General a particular role—such as the language in 8 C.F.R. §1003.1(a)(2) that "[T]he Attorney General shall designate one of the Board members to serve as chairman"—implies that the lack of such language in the TAIJ

---

[4] Finally, Mboba submits that the TAIJ schema is invalid under Office of Personnel Management regulations. However, he fails to demonstrate that the regulations in question do, in fact, apply to TAIJs. Given this failure, we deem this argument waived.

[5] For this proposition, Mboba cites *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 n.7 (5th Cir. 2003) ("Bridas attempted to appeal, in a footnote, the district court's determination [on an issue]. Arguments that are insufficiently addressed in the body of the brief, however, are waived."). Though a strong quote, it applies only to arguments in an *appellant's* brief.

section was deliberate. Moreover, Mboba reads the language in 8 C.F.R. §1003.1(a)(1) that "[t]he [BIA] members shall be attorneys appointed by the Attorney General" to exclude the Attorney General's appointment power over TAIJs. This argument is neither mandated by a reading of the regulations nor consistent with a fair reading of the whole regulatory scheme surrounding the BIA. To put it simply: TAIJs, though only temporarily appointed, are nonetheless BIA members. *See* 8 C.F.R. §1003.1(a)(4) (emphasis added) ("The Director may in his discretion designate [certain individuals] … to act as *temporary Board members* for terms not to exceed six months. … A temporary Board member *shall have the authority of a Board member*… [except with regard to *en banc* matters]."). Section 1003.1(a)(1) states that BIA members shall be appointed by the Attorney General. Thus, a contextual reading of the regulations clearly indicates that the Attorney General appoints TAIJs.

### B. Merits of the Denial

On the merits, "we review the BIA's denial of a motion to reopen or to reconsider under a highly deferential abuse-of-discretion standard." *Zhao v. Gonzales*, 404 F.3d 295, 303 (5th Cir. 2005). Moreover, "motions to reopen are disfavored in deportation proceedings." *I.N.S. v. Abudu*, 485 U.S. 94, 107 (1988). "A motion to reopen proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2.

Mboba's motion to reopen was premised on three grounds: (1) that his previously-undiagnosed mental health conditions made him unable to present credible testimony, (2) that his newly secured corroborating evidence presents material evidence in his favor, and (3) that the IJ deprived Mboba of

his right to a fair hearing (for the reasons identified in the petition for review before this court).

The TAIJ denied Mboba's motion to reopen in full. First, she held that Mboba had "not demonstrated that the evidence that he seeks to present on reopening … [is] new and [was] previously unavailable." She also found that neither Mboba's argument regarding mental incompetency nor his argument regarding the IJ's conduct found "support in the record." The TAIJ noted that "there were no indicia of incompetency presented to the Immigration Judge." Moreover, she noted that Mboba had not demonstrated that evidence of his mental incompetence was "new and … previously unavailable." Finally, the TAIJ held that a motion to reopen was not the proper avenue for an appeal regarding the IJ's conduct, and that, in any event, Mboba's arguments on the issue were without merit.

Mboba contends on appeal that the evidence on which he relies was, in fact, new and previously unavailable at the time of the motion to reopen. In relevant part, Mboba's motion relied on: (1) an affidavit from a doctor concerning a psychological evaluation conducted regarding Mboba, (2) an affidavit from Mboba's uncle concerning the political persecution from which he and Mboba fled, (3) Mboba's uncle's medical records, (4) an article concerning the relationship between trauma and disordered memories, (5) newly created country conditions reports regarding the DRC, and (6) an affidavit from Mboba himself. Mboba submits that "essentially all the evidence did not exist anywhere in the world at the time of the hearing [because] [t]he documents simply had not been created and could not have been created because of the conditions surrounding Mr. Mboba." However, in making this argument, Mboba confuses the vehicles by which evidence is presented for the evidence itself. More bluntly: the relevant evidence is not the documents themselves but that to which the documents testify. *C.f. Luna-Garcia De Garcia v. Barr*, 921 F.3d 559, 566 (5th Cir. 2019) (emphasis

added) ("the pertinent *information contained in* [the] affidavit was not previously unavailable"). For example, Mboba's contention is not that he developed PTSD *after* the hearing before the IJ, but that his PTSD was not yet diagnosed.[6] This evidence is not of the sort that "could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2. There was thus no abuse of discretion in denying the motion to reopen.

## V. Conclusion

For the foregoing reasons, we GRANT Mboba's first petition as to his CAT claims and remand for further proceedings on that issue. We DENY the first petition as to all other claims and likewise DENY his second petition.

---

[6] As a side note, the government suggests that Mboba's psychological evaluation was "effectively generated to explain away the agency's largely unchallenged adverse credibility determination." Such a suggestion is at best unnecessary and has no support in the record beyond speculative linkage.